# Exhibit 4

**Security Agreement**

## SECURITY AGREEMENT

This Security Agreement is made effective on June 29, 2019, between **CHRISTINE SKANDIS**, an individual, whose address is 539 West South Street, Kalamazoo, MI 49007 ("Debtor"), and **DePERNO LAW OFFICE, PLLC**, a Michigan professional services company, which address is 951 W. Milham Avenue, Portage, Michigan 49024 ("Secured Party").

1.  <u>Definitions</u>.

    a.  "Collateral" shall include the Debtor's (1) tangible personal property, fixtures, leasehold improvements, trade fixtures, and equipment, and any other personal property described on Exhibit "A" attached hereto and made a part hereof (collectively the "Personal Property"); (2) all general intangibles relating to or arising from the Personal Property; (3) all cash and non-cash proceeds (including insurance proceeds) of the Personal Property; (4) all products thereof and all additions and accessions thereto, substitutions therefor and replacements thereof; and (5) all records and data relating to any of the Personal Property described in this section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Debtor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

    b.  "Collateral Assignment" means that certain Collateral Assignment of Lessee's Leasehold Interest in Lease, dated as of the date hereof, made by Debtor, as assignor, for the benefit of Secured Party, as assignee.

    c.  "Loan Documents" means the Note (as hereafter defined), the Collateral Assignment, this Agreement and all other documents and instruments evidencing, securing or executed in connection therewith.

    d.  "Note" means that certain Promissory Note, dated as of the date hereof, made by Debtor, for the benefit of Secured Party, in the original principal amount of $12,000.00

    e.  "Obligations" shall include all debts, liabilities, obligations, covenants and duties owing from the Debtor to the Secured Party of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Debtor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether evidenced by or arising under the Note or this Agreement or, whether absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, and all costs and expenses of the Secured Party incurred in the enforcement, collection or otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses.

    f.  "UCC" means the Uniform Commercial Code, as adopted and enacted and as in effect from time to time in the State of Michigan. Terms used herein which are defined in the UCC and not otherwise defined herein shall have the respective meanings ascribed to such terms in the UCC.

2.  <u>Grant of Security Interest</u>. To secure the Obligations, the Debtor, as debtor, hereby assigns and grants to the Secured Party, as secured party, a continuing lien on and security interest in the

Collateral, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

3.  <u>Indebtedness Secured</u>. The foregoing security interest is given to secure payment and performance of the Obligations and indebtedness of Debtor now or later owing to Secured Party, including, but not limited to, all future advances and all obligations and indebtedness of Debtor to Secured Party under this Security Agreement and under all other security agreements, loan agreements, pledge agreements, assignments, mortgages, guaranties, notes, leases, and other agreements, instruments, and documents that have been or are in the future signed by Debtor, and all extensions or renewals of the indebtedness and obligations.

4.  <u>Change in Name or Locations</u>. The Debtor hereby agrees that if the location of the Collateral changes from the locations listed on Exhibit "A" hereto and made part hereof, or if the Debtor changes its name or form or jurisdiction of organization, or establishes a name in which it may do business, the Debtor will immediately notify the Secured Party in writing of the additions or changes. The Debtor's primary address is listed at the beginning of this Agreement.

5.  <u>Warranties, Representations and Agreements</u>. Debtor warrants and represents to, and agrees with, Secured Party as follows:

    a.  the Debtor has good, marketable and indefeasible title to the Collateral, has not made any prior sale, pledge, encumbrance, assignment or other disposition of any of the Collateral, and the Collateral is free from all encumbrances and rights of setoff of any kind except the lien in favor of the Secured Party created by this Agreement;

    b.  except as herein provided, the Debtor will not hereafter without the Secured Party's prior written consent sell, pledge, encumber, assign or otherwise dispose of any of the Collateral or permit any right of setoff, lien or security interest to exist thereon except to the Secured Party; and

    c.  the Debtor will defend the Collateral against all claims and demands of all persons at any time claiming the same or any interest therein

6.  <u>Debtor's Covenants</u>. The Debtor covenants the following:

    a.  Debtor will not cause or permit any lien, security interest or encumbrance to have priority over the security interest created hereby ("permitted liens"), and Debtor will not sell, assign, or transfer any Collateral or permit any Collateral to be transferred by operation of law.

    b.  Debtor will maintain all records concerning the Collateral at Debtor's primary address listed herein.

    c.  Debtor will furnish Secured Party with the information regarding the Collateral that Secured Party shall from time to time request and will allow Secured Party at any reasonable time to inspect the Collateral and Debtor's records regarding the Collateral.

    d.  Debtor will execute, file, record, or procure from third persons the financing statements, subordination agreements, and other documents and take all other action that Secured Party may deem necessary to perfect, to continue perfection of, or to maintain first priority of Secured Party's security interest in the Collateral.

e.  Secured Party may file a photocopy of this Security Agreement as a financing statement evidencing Secured Party's security interest in the Collateral.

f.  Debtor shall from time to time and at all reasonable times allow the Secured Party, by or through any of its officers, agents, attorneys, or accountants, to examine or inspect the Collateral, and obtain valuations and audits of the Collateral, at the Debtor's expense, wherever located. The Debtor shall do, obtain, make, execute and deliver all such additional and further acts, things, deeds, assurances and instruments as the Secured Party may require to vest in and assure to the Secured Party its rights hereunder and in or to the Collateral, and the proceeds thereof, including waivers from landlords, warehousemen and mortgagees.

g.  Debtor shall only use or permit the Collateral to be used in accordance with all applicable federal, state, county and municipal laws and regulations

h.  Debtor will immediately notify Secured Party in writing of any change in Debtor's name, identity, or corporate structure and of any change in the location of Debtor's place of business and of the location of each additional place of business established by Debtor.

i.  Debtor will indemnify Secured Party with respect to all losses, damages, liabilities, and expenses (including attorney fees) incurred by Secured Party by reason of any failure of Debtor to comply with any of Debtor's obligations under this Security Agreement or by reason of any warranty or representation made by Debtor to Secured Party in this Security Agreement being false in any material respect.

j.  Debtor will maintain all tangible Collateral in good condition and repair and maintain fire and extended coverage insurance covering all tangible Collateral in the amounts and against the risks that is customarily maintained by similar people or businesses, or as Secured Party may reasonably request. Each insurance policy will provide that its proceeds will be payable to Secured Party to the extent of Secured Party's interest in the Collateral and that the policy will not be canceled, and the coverage will not be reduced, without at least ten (10) days prior written notice by the insurer to Secured Party. Debtor will provide Secured Party with evidence of the insurance coverage on demand. Debtor agrees that Secured Party may act as agent for Debtor in obtaining, adjusting, and settling such insurance and endorsing any draft evidencing proceeds of it.

7.  <u>Secured Party's Right to Perform</u>. If Debtor fails to perform any obligation of Debtor under this Security Agreement, Secured Party may, without giving notice to or obtaining the consent of Debtor, perform that obligation on behalf of Debtor. For example, this may include obtaining insurance coverage for Collateral or for paying off liens on Collateral. Debtor will reimburse Secured Party on demand for any expense that Secured Party incurs in performing any such obligation and will pay to Secured Party interest on it, from the date the expense was incurred by Secured Party, at an annual rate equal to two percent points (2%) above the "Prime Rate" of interest published by the *Wall Street Journal* on the first date of the default, and if not being a business day, then as published on the next business day. Secured Party is not required to perform an obligation that Debtor has failed to perform. If Secured Party does so, that will not be a waiver of Secured Party's right to declare the indebtedness immediately due and payable by reason of Debtor's failure to perform.

8.  <u>Negative Pledge; No Transfer</u>. The Debtor will not sell or offer to sell or otherwise transfer or grant or allow the imposition of a lien or security interest upon the Collateral or use any portion

Security Agreement – Page 3 of 9 – Initials: 

thereof in any manner inconsistent with this Agreement or with the terms and conditions of any policy of insurance thereon.

9. <u>Further Assurances</u>. Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of Debtor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of the Michigan Uniform Commercial Code or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by the Michigan Uniform Commercial Code for the sufficiency or filing office acceptance of any financing statement or amendment, including, but not limited to (i) whether Debtor is an organization, the type of organization and (ii) any organization identification number issued to Debtor. Debtor agrees to furnish any such information to Secured Party promptly upon request. Debtor also ratifies its authorization for Secured Party to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

10. <u>Events of Default and Acceleration</u>. The Debtor shall, at the Secured Party's option, be in default under this Agreement upon the happening of any of the following events or conditions (each, an "Event of Default")

    a.    If default occurs in the payment or performance of any of the indebtedness, when and as it shall be due and payable.

    b.    The failure by the Debtor to perform any of its other obligations under this Agreement.

    c.    Falsity, inaccuracy or material breach by the Debtor of any written warranty, representation or statement made or furnished to the Secured Party by or on behalf of the Debtor.

    d.    An uninsured material loss, theft, damage, or destruction to any of the Collateral, or the entry of any judgment against the Debtor or any lien against or the making of any levy, seizure or attachment of or on the Collateral.

    e.    The failure of the Secured Party to have a perfected first priority security interest in the Collateral.

    f.    Any indication or evidence received by the Secured Party that the Debtor may have directly or indirectly been engaged in any type of activity which, in the Secured Party's discretion, might result in the forfeiture of any property of the Debtor to any governmental entity, federal, state or local

    g.    If default occurs in the performance of any obligation of Debtor to Secured Party under this Security Agreement or under any promissory note or other instrument at any time evidencing any indebtedness or under any other security agreement, loan agreement, mortgage, assignment, guaranty, or other agreement that now or later secures or relates to any indebtedness or obligation now or later owing by Debtor to Secured Party or that secures or relates to any guaranty of any such indebtedness or obligation ("security documents").

Security Agreement – Page 4 of 9 – Initials: 

h.   If any warranty, representation, or statement made to Secured Party by Debtor or by any guarantor of all or part of the indebtedness ("Guarantor") in this Security Agreement or in any security document, credit application, financial statement, or otherwise, was false in any material respect when made or furnished.

i.   If Debtor dissolves, becomes insolvent, or makes an assignment for the benefit of creditors.

j.   If any guaranty that now or later secures payment or performance of all or any part of the indebtedness is terminated or limited for any reason, without the written consent or agreement of Secured Party.

k.   If a voluntary or involuntary case in bankruptcy, receivership, or insolvency is at any time commenced by or against Debtor, then the entire indebtedness shall automatically become immediately due and payable, without notice or demand. All or part of the indebtedness also may become, or may be declared to be, immediately due and payable under the terms of any note at any time evidencing any of the indebtedness or of any loan agreement, security document or other agreement entered into between Debtor and Secured Party.

11.   <u>Secured Party's Rights and Remedies</u>. Upon the occurrence of any such Event of Default and at any time thereafter, the Secured Party may declare all Obligations secured hereby immediately due and payable and shall have, in addition to any remedies provided herein or by any applicable law or in equity, all the remedies of a secured party under the UCC. Without limiting these rights and remedies:

a.   Peaceably by its own means or with judicial assistance enter the Debtor's premises and take possession of the Collateral without prior notice to the Debtor or the opportunity for a hearing.

b.   Upon demand by Secured Party, shall deliver the Collateral and proceeds of Collateral to Secured Party at such place as Secured Party shall designate, and Secured Party may dispose of the Collateral in any commercially reasonable manner.

c.   The proceeds of any collection or disposition of Collateral shall be applied first to Secured Party's attorney fees and expenses, as provided in this Agreement, and then to the indebtedness, and Debtor shall be liable for any deficiency remaining.

d.   Upon the occurrence of an Event of Default, (i) without notice or demand to Debtor, Secured Party shall be entitled to notify Debtor's account debtors and obligors to make all payments directly to Secured Party, and Secured Party shall have the right to take all actions that Secured Party considers necessary or desirable to collect upon the Collateral, including without limitation prosecuting actions against, or settling or compromising disputes and claims with, Debtor's account debtors and obligors, (ii) without notice or demand to Debtor, Secured Party may receive, open, dispose of, and notify the postal authorities to change the address of, mail directed to Debtor, and (iii) upon demand by Secured Party, Debtor shall immediately deliver to Secured Party, at such place as Secured Party shall designate, all proceeds of the Collateral and all books, records, agreements, leases, documents, and instruments evidencing or relating to the Collateral.

Security Agreement – Page 5 of 9 – Initials: 

e.    All rights and remedies of Secured Party shall be cumulative and may be exercised from time to time.

Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Secured Party will give the Debtor reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made. The requirements of commercially reasonable notice shall be met if such notice is sent to the Debtor at least five (5) days before the time of the intended sale or disposition. Expenses of retaking, holding, preparing for sale, selling or the like shall include the Secured Party's reasonable attorney's fees and legal expenses, incurred or expended by the Secured Party to enforce any payment due it under this Agreement either as against the Debtor, or in the prosecution or defense of any action, or concerning any matter growing out of or connection with the subject matter of this Agreement and the Collateral pledged hereunder. The Debtor waives all relief from all appraisement or exemption laws now in force or hereafter enacted

12.    Expenses. Debtor agrees to pay upon demand all of Secured Party's costs and expenses, including reasonable attorneys' fees and Secured Party's legal expenses, incurred in connection with the enforcement of this Security Agreement. Secured Party may pay someone else to help enforce this Security Agreement, and Debtor shall pay the costs and expenses of such enforcement. Costs and expenses include Secured Party's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (and including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Debtor also shall pay all court costs and such additional fees as may be directed by the court.

13.    Amendment and Waivers. No provision of this Security Agreement may be modified or waived except by a written agreement signed by the Secured Party and Debtor. Secured Party will continue to have all of its rights under this Security Agreement even if it does not fully and promptly exercise them on all occasions. Secured Party may, at its option, *(a)* waive any default, or defer an action on any default; *(b)* extend or modify the time or manner of payment of the indebtedness or waive or modify any term or condition relating to the indebtedness; *(c)* release Collateral or other security for the indebtedness; *(d)* release any person liable for any of the indebtedness, including any borrower or Guarantor; or *(e)* make advances o other extensions of credit secured by this Security Agreement; all without giving Debtor notice or obtaining debtor's consent. Any such action by Secured Party will not release or impair its security interest in the Collateral or Debtor's obligations under this Security Agreement. Secured Party's security interest in the Collateral and Debtor's obligations under this Security Agreement will not be released or impaired if Secured Party fails to obtain, perfect, or secure priority of any other security for the indebtedness that is agreed to be given, or is given, by anyone else. Secured Party is not required to sue upon or otherwise enforce payment of the indebtedness or any other security before exercising its rights under this Security Agreement.

14.    Severability. If any provision of this Security Agreement, or the application thereof shall, to any extent, be invalid or unenforceable, the remainder of this Security Agreement, or the application of such provision to persons or circumstances, other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Security Agreement shall be valid and enforceable to the fullest extent permitted by law.

15.    Drafting. This Security Agreement has been executed after negotiation and the opportunity by both parties to have this Security Agreement reviewed and revised by legal counsel of their

choice. None of the provisions of this Security Agreement shall be interpreted or construed against a party hereto solely by virtue of the fact that any such provision shall have been drafted by legal counsel representing such party.

16. <u>Counterparts</u>. This Security Agreement may be executed and delivered in any number of counterparts, all of which when executed and delivered shall have the force and effect of an original, except that some schedules may exist only on the original copy retained in the Secured Party's records. A telecopied signature of a party shall stand as the original.

17. <u>Notices</u>. Any notice to Debtor or to Secured Party shall be deemed to be given if and when mailed, with postage prepaid, to the respective address of Debtor or Secured Party appearing on the first page of this Security Agreement, or if and when delivered personally.

18. <u>Headings and Terms</u>. Headings, in this Security Agreement, are provided solely for the convenience of the parties and shall not be used to interpret or construe its provisions. Nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the person or persons, firm or corporation may in the context require.

19. <u>Governing Law and Choice of Forum</u>. This Security Agreement shall be governed and controlled in all respects by the laws of the State of Michigan, including as to interpretation, enforceability, validity, and construction. The parties submit to the jurisdiction and venue of the circuit court for the County of Kalamazoo, State of Michigan or, if original jurisdiction can be established, the United States District Court for the Western District of Michigan with respect to any action arising, directly or indirectly, out of this Security Agreement or the performance or breach of this Security Agreement. The parties stipulate that the venues referenced in this Security Agreement are convenient.

20. <u>Binding Effect and Third Party Rights</u>. This Security Agreement shall be binding upon and inure to the benefit of Debtor and Secured Party and their respective successors and assigns; ; and is not entered into for the benefit of, and shall not be construed to confer any benefit upon, any other party or entity.

21. **<u>WAIVER OF JURY TRIAL</u>. EACH OF THE DEBTOR AND THE SECURED PARTY IRREVOCABLY WAIVES ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS AGREEMENT, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. THE DEBTOR AND THE SECURED PARTY ACKNOWLEDGE THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.**

**[SIGNATURES APPEAR ON NEXT PAGE]**

Security Agreement – Page 7 of 9 – Initials: 

Debtor and Secured Party have executed this Security Agreement on the date listed on the first page of this Security Agreement.

**DEBTOR:**

DATED: JUNE 2?, 2019

Christine Skandis

**SECURED PARTY:**

DEPERNO LAW OFFICE, PLLC

DATED: JUNE 29, 2019

Matthew S. DePerno, Member

Security Agreement – Page 8 of 9 – Initials: 

**EXHIBIT A**

| Item | Location |
|------|----------|
| Approx. 25 art pieces (including jade) | Gretchen Molotky's possession |
| (3) antique Chinese royal wedding beds | 530 West South Street, Kalamazoo, MI 49007 |
| (5) antique Chinese armoires | 530 West South Street, Kalamazoo, MI 49007 |
| (1) 9 feet x 9 feet carved jade ship | 530 West South Street, Kalamazoo, MI 49007 |
| (2) lacquer Chinese themed cabinets | 530 West South Street, Kalamazoo, MI 49007 |
| All other art pieces | 530 West South Street, Kalamazoo, MI 49007 and 312 Hoffman Street, Saugatuck, MI 49453 |
| All other jade pieces | 530 West South Street, Kalamazoo, MI 49007 and 312 Hoffman Street, Saugatuck, MI 49453 |
| All other Chinese collectibles and antiques | 530 West South Street, Kalamazoo, MI 49007 and 312 Hoffman Street, Saugatuck, MI 49453 |
| 50 cases, 2005, Barbera | 530 West South Street, Kalamazoo, MI 49007 |
| 11 cases, 1999, Passito | 530 West South Street, Kalamazoo, MI 49007 |
| 30 bottles, 1983, Passito | 530 West South Street, Kalamazoo, MI 49007 |
| 50 cases, 750ml, Nebbiola/Barbera/Fresia/Neretto | 530 West South Street, Kalamazoo, MI 49007 |
| 100 cases, 1.5 L, Nebbiola/Barbera/Fresia/Neretto | 530 West South Street, Kalamazoo, MI 49007 |