STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF KALAMAZOO

MATTHEW S. DEPERNO

Plaintiff,

CASE NO. B 06-0283-CZ

v

HON. CALVIN E. OSTERHAVEN BY
ASSIGNMENT

KREIS, ENDERLE, CALLANDER & HUDGINS, P.C., a
Michigan professional corporation; KECH LEASING, a
Michigan general partnership; SECURE HORIZONS
FINANCIAL SERVICES, LLC, a Michigan limited
liability company, ALAN G. ENDERLE, RUSSELL A.
KREIS, DOUGLAS L. CALLANDER, C. REID
HUDGINS, III, ROBERT B. BORSOS, STEPHEN J.
HESSEN, and JAMES C. BOERIGTER

Defendants.

---

Sam Morgan (P36694)
SOMMERS SCHWARTZ
Attorneys for Plaintiff
200 Town Center, Suite 900
Southfield, MI 48075-1100
(248) 355-0300

Thomas F. Blackwell (P10856)
Thomas M. Weibel (P26814)
Matthew L. Wikander (P65160)
SMITH HAUGHEY RICE & ROEGGE
Attorneys for Defendants
250 Monroe Avenue, N.W.
200 Calder Plaza Building
Grand Rapids, MI 49503-2251
(616) 774-8000

Douglas L. Callander (P24852)
KREIS ENDERLE CALLANDER &
HUDGINS, P.C.
Co-Counsel for Defendants
P. O. Box 4010
Kalamazoo, MI 49003-4010
(269) 324-3000

---

## RESPONSE AND OBJECTIONS TO PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS

## INTEROFFICE MEMORANDUM

TO: STEVE HESSEN, JEFF SWENARTON

FROM: MIKE BEAM

SUBJECT: MSD TIMEKEEPING

DATE: 10/12/05

CC: ALAN ENDERLE

*CONFIDENTIAL*

### MSD TIMEKEEPING ISSUES

Following is a summary of timekeeping issues existing with Matt's time/clients. I believe there are 4 issues existing:

1. Time is being entered without an explanation.

2. Billable hours are being "padded." Time is being entered on clients with little chance of collection or immediately preceeding a write-off of the account balance.

3. As a result of #2, write-offs are excessive.

4. Matt appears to be manipulating the timekeeping/billing system to maintain his quota hours on accounts that may not render payment. New account codes have been opened with the same billing party while a collection problem is indicated with the existing account.

### Time Entries Without Explanation:

There are a total of 75 hours entered during the calendar year with no description of time. This amounts to $14,590 of billed charges. One attachment shows these entries by date (may not be "all inclusive"). Some of these entries may be accidental, some may be billing against a prepaid to "use up" the balance, however, 75 hours seems excessive, particularly when looking at specific entries:

- Burrill Construction (MDBURR-04) - Prebill attached showing entries on 7/14, 7/20, 8/9, 8/10, 8/11 for a total of 17 hours of billed time after receipt of settlement agreement – FEG was litigating. Settlement received through our office was $15,000+; matter was hourly, not contingent. Total write-off of $10,706.

- Edge Design – Contingent Fee matter billed 16 hours on August 1 & 2 without explanation.

- Chamness (CHAMN-04) - 3 entries for a total of 11 hours without explanation.

### Excessive billing/write-offs (see attached "Collection Analysis"):

In addition to time entries without explanation, Matt appears have significant time entered on accounts also having high write-offs:

KECH000036

- Burrill Construction – see above.

- Mencl - $28,493.76 written off – All matters locked on 7/13/05; Over $20,000 billed on August 9 followed by a write-off on August 22. All contingent fee cases have the following explanation entered in Juris: PER MSD WROTE OFF BALANCE OF $xx BECAUSE THEY ARE GOING BANKRUPTE. TAK–08/22/2005. MENCL-11,12,13 continue to carry a balance $3,656?

- Lavine – Billed $11,652 in May & June; $7,652 write-off; $63 collected; $4,000 balance. Entry in Juris: PER MSD ON HIS 06/30/2005 DRAFT THE BALANCE OF THIS ACCOUNT IS $11,652.00. WRITE OFF TO $4000.00 BALANCE. TAK==07/12/2005.

<u>Manipulating the system:</u>

- Black Kase Cheese / Blair Schwatz – At the end of 2003, balance on SCHWZ account was $3,821.50. During all of 2004, the client paid $990.50 and we billed $308.50, leaving a balance at the end of 2004 of $3,139.50. During 2005, the client paid a $190 payment in January, we billed $7,743 in January, leaving a balance on SCHWZ of $10,692. On 4/25/05, a new code was opened for BLKASE, a total of $11,632 of time was billed on the code; a total of $200 in payments have been received on this account ($100 in August; $100 in September). See invoice/billed details attached.

- DeCuypere/Town & Country Sheet Metal. Similar to above a year earlier. DeCuypere account is a collection problem with MSD taking a hard line - locking the account and holding for payment. Eventually, DeCuypere account is closed and TOWCS account is opened. The balance on the DeCuypere matter "04 – Bankruptcy" is closed and moved to TOWCS matter "01-Business" and "02-Personal". Review of initial billings shows time spent on bankruptcy and reorganization matters with no prepaid balance on account. $20,600 billed within 4 months on payments of $442. Account locked per SJH instructions on 4/29/04.

- Edge Design – EDGE-02 opened with the following comments: 10/11/04 Adverse: NexTech Systems, Inc. (South Lyon, MI) and William Restis, Principal and 10/18/04 Original signed contingent fee agreement on file re S.J.S. Contractors, Inc./In the event there is no recovery, client agrees to pay expenses/In the event there is a recovery client agrees to pay expenses and attorney fees of 1/4 of the net recovery. followed by 3/31/05 NexTech, Inc. dba NexTek, Inc. FILE NO: Chapter 7 / File No. 05-48163 / EDMI DATE FILED: March 16, 2005 ASSETS: No Asset Case ADR:  c/o William R. Restis. No change in fee agreement, billed $7,839 since note entered on Chapter 7 filing. Billing was sent out on this account in September, followed by call from client maintaining he didn't know what the billing was for; billing was adjusted back to unbilled time and then "rebilled" to client for 2005 time only. See attached email. Why is this being billed now, billing was reversed then re-billed (but only for 2005 time)?

KECH000037



## ENGAGEMENT AND FEE AGREEMENT
## AND
## PROMISSORY NOTE AND SECURITY AGREEMENT

This Agreement is made as of March 4, 2013 by and between DePERNO LAW OFFICE, PLLC., a Michigan professional limited liability company, which address is PO Box 536, Mattawan, MI 49071 (the "Law Firm") and RONALD MOFFIT, CATHLEEN MOFFIT, and A&P ENTERPRISES OF MICHIGAN, LLC, all of whose address is 555 Shady Lane, Decatur, MI 49045 (collectively referred to as "you" or the "Client").

## BACKGROUND

This is a request for services by you to the Law Firm for services to be rendered, and will constitute an engagement agreement between the parties. This Agreement outlines the nature of the services to be rendered by the Law Firm, along with the terms and conditions thereof. Specifically, you have requested that the Law Firm represent you with respect to general business concerns, a lawsuit with Home Owners Insurance Company, and other potential legal matters. This Agreement is to confirm our understanding of the terms of our engagement and the nature and limitations of the services to be provided.

NOW, THEREFORE, in consideration of the foregoing and the terms and conditions set forth herein, the parties hereby agree as follows:

## TERMS AND CONDITIONS

1.   THE FEES.

1.1   Model Rules of Professional Responsibility. You understand that the Model Rules of Professional Conduct adopted by the Michigan Supreme Court lists the following factors to be considered in establishing a reasonable fee for legal services: (a) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (b) the likelihood, if apparent to you, that the acceptance of the particular employment will preclude other employment by the Law Firm; (c) the fee customarily charged in the locality for similar legal services; (d) the amount involved and the results obtained; (e) the time limitations imposed by you or by the circumstances; (f) the nature and length of the professional relationship with you; (g) the experience, reputation, and ability of the lawyer or lawyers performing the services.

1.2   Hourly Rate. The Law Firm normally sends bills to clients once each month, or later if determined necessary by the Law Firm. The Law Firm begins by reviewing the time devoted to the matter during the month. Time is recorded daily in one-tenth (1/10) hour minimum time blocks. The time is multiplied by the hourly rate of $250.00 for each person performing the services. These rates are subject to change after January 1, in each year. After reviewing the time devoted to the matter, the other factors in ¶ 1.1 above are considered. Accordingly, your bill will not be based solely upon the time devoted to the matter. It will, however, be for an amount not less than the hourly rate. Further, the Law Firm may not provide a monthly billing if it does not feel that it is justified or necessary.

1

1.3    Expenses. In addition to the legal fees, all expenses incurred by the Law Firm will be charged to you. Specifically, you will be charged for long distance telephone calls, facsimile services, photocopying (22¢ per copy), mileage for travel out of town (50¢ per mile), postage (other than for routine letters), couriers (FedEx, etc.), and any other expenses reasonably necessary to accomplish the task for which the Law Firm has been engaged. There may be other expenses incurred which are not among those enumerated above, which are the common expenses. In some cases, you may be asked to pay expenses in advance.

1.4    No Estimates Provided. You understand and agree that the Law Firm has not, and is unable to, provide an estimate of the final bill or any guarantee of specific results. There are too many factors that may serve to complicate a legal matter. You understand and agree that if you have a question, at any time, as to where you stand in regard to any bill, it is your responsibility to contact the Law Firm, which will attempt to provide an accurate estimate of the bills current status.

2.    **PAYMENT OF FEES.**

2.1    Promise to Pay Current Fees and Future Advance (Note). This Agreement confirms the understanding and agreement that the Clients collectively and jointly and severally owes to the Law Firm $53,126.80 as of the December 24, 2012 billings and that you hereby agree to pay to the Law Firm, its successors and assigns, the principal amount of $53,126.80, plus all future fees and expenses rendered by the Law Firm, with interest at the rate of two (2.0%) percent per annum, with monthly payments of $250.00 with interest to be computed at the time of each payment and deducted from said payments, and the balance to be applied to principal. At such time as the lawsuit involving Home Owners Insurance Company is complete, the balance due at the time of case completion shall be due in full, unless otherwise agreed in writing. This debt shall hereinafter be referred to as the "Promissory Note." Payments shall be applied to the oldest invoices first. Any amounts received in settlement shall be paid first to the Law Firm, unless otherwise agreed. You agree to pay all expenses in advance, which shall be an additional amount due from the monthly and quarterly payments. The Client currently has their property at 555 Shady Lane, Decatur, Michigan for sale. When the Shady Lane property sells, the Client agrees to pay the Law firm $10,000.00 at closing.

2.2    Additional Promissory Note Terms . The above described amount represents past due attorney fees which the Client agrees are reasonable. In the event of default in the payment hereunder, the entire unpaid balance hereunder shall become due in full. The undersigned shall have the right to pay larger installments than above provided for, and to pay the whole or any part of the balance remaining unpaid at any time before the same, by the terms hereof, becomes due and payable. In the event of default for a period of thirty (30) days in the payment of any installment due on this Promissory Note, the entire unpaid balance hereunder shall, at the option of the holders hereof, without notice, become immediately due and payable. Any failure to exercise this option shall not constitute a waiver of the right to exercise the same at a future date. The holders hereof, at their option, may extend the time for payment of this Promissory Note or any installment thereof, or reduce the payment thereof, or accept a renewal Promissory Note or Promissory Notes; and any such extension, reduction or renewal shall not relieve the undersigned from any liability hereunder. Protest, presentment, demand, and notice of non-payment are hereby waived by the undersigned.

2.3    Payment of Future Fees. The Law Firm has the option and the discretion to continue work on your behalf in the event the retainer has been exhausted. In that event you will be billed on a monthly basis. All billings will be payable upon receipt. Any agreement for other payment terms must be in writing. If billings are not paid promptly, the Law Firm shall have the option, but not the obligation, to

2

not perform further services. In addition, if it appears to the Law Firm at any time that there are insufficient funds from which to pay the fees and costs, or it appears that for any other reason the fees and costs will not be paid, the Law Firm reserves the right to discontinue representation under this Agreement. Any amount due pursuant to this Agreement shall be due collectively and jointly and severally by each person signing this agreement.

      **2.4**    <u>Interest and Late Fees</u>. Any future bill or portion thereof which remains unpaid for thirty (30) days shall bear interest at the rate of two (2%) percent per annum. You further agree to pay a monthly late fee of $25.00 on any bill or portion thereof which remains unpaid for thirty (30) days. You understand the late fee is imposed to offset actual costs of the Law Firm incurred in time and money (including lost work) spent sending additional reminder notices or in other collection efforts when bills are not paid timely. Any provision conflicting with any statute or rule of law of the State of Michigan (including any statute or rule of law relating to the maximum rate of interest that or amount of late fees which can be charged to you), or otherwise unenforceable for any reason, shall be deemed severable from the balance of this Agreement and shall be enforced to the maximum extent permitted by law and shall not invalidate any other provision contained in this Agreement.

      **2.5**    <u>Collection Costs</u>. If it is necessary for the Law firm to incur costs for collection of fees and expenses advanced by the Law Firm or otherwise (whether by lawsuit or otherwise) you agree to pay, in addition to any judgment, all costs and expenses necessitated thereby, including actual attorney fees and time required and spent by the Law Firm to collect the fees. By signing this Agreement, you specifically and knowingly waive any objection or defense to the amount of attorney fees and the interest rate and late fees, such as usury or otherwise.

      **2.6**    <u>Charging and/or Retaining Lien; Security Interest</u>. By acceptance of this Agreement, you acknowledges that (a) the Law Firm shall have a general, retaining, or possessory lien on all documents, money, or other property of you until all fees are paid; (b) the Law Firm shall be entitled to file a special, particular, or charging lien upon any real and personal property owned by you in order to recover any fees and costs which remain unpaid for sixty (60) days after the original billing date; and (c) the Law Firm shall be entitled to file an actual or constructive mortgage on real estate you own with the appropriate county register of deeds office and UCC financing statement with the appropriate agency. The Client does not object to the Law Firm filing an actual or constructive mortgage or financing statement.

      **2.7**    <u>Events of Default</u>. Occurrence of any one of the following events shall constitute an "event of default" under this Agreement: (a) breach, failure of payment, or default by the Client of or under and of the terms, conditions, or covenants of this Agreement, or any other document or agreement signed by the Client with or in favor of the Law Firm; (b) the Client makes an assignment for the benefit of creditors, or a receiver, liquidator, or trustee is appointed for the Client or any of its property; (c) any proceeding under any insolvency or bankruptcy law is instituted by or against the Client or any action is taken to realize upon or any proceeding is instituted to foreclose any mortgage, security interest, or lien of any kind against any of the Client's property; (d) any representation, warranty, financial statement, report, or other information made or furnished by or on behalf of the Client to the Law Firm at any time proves to be, or has been, false or misleading when made or furnished; and/or (e) any substantial damage or destruction to any of Client's property or the issuance of any attachment, levy, garnishment or other judicial process or proceeding upon or in respect of this Agreement or any of Client's property. In the event the Client, collectively or individually, files bankruptcy, the Client agrees to sign a reaffirmation agreement to reaffirm the debt herein.

3

2.8    Remedies. Upon the occurrence of any event of default, the entire liability hereunder shall be immediately due and payable without demand or notice, and the Law Firm may take one or more of the following actions not contrary to law: (a) foreclose its mortgage or lien by legal proceedings and collect its actual attorney fees as awarded by the Court; (b) sell, grant, and convey the Client property, or cause the property to be sold, granted, and conveyed at law, pursuant to the statute in such case made and provided and out of the proceeds of such sale to retain the sums due under this Agreement, mortgage, or lien, and all costs and charges of the sale (including, without limitation, the attorney fees provided by statute), rendering the surplus moneys, if any, to the Law Firm or as otherwise provided by law, and in the event of a public sale and unless otherwise prohibited by law, the property may be sold as one or more parcels, the Law Firm may sell the property for cash and/or secured credit, and the Law Firm may give a warranty deed to the purchaser binding upon the Client and all claiming under the Client; (c) as to any equipment, exercise any of the rights and remedies of a creditor under the Uniform Commercial Code, or oter law, and any Court Rule; (d) enter upon the property and take other actions as the Law Firm deems appropriate to perform the Law Firm's obligations under this Agreement, mortgage, or lien, to inspect, repair, protect, or preserve the property; (e) exercise any and all rights granted to the Law Firm herein; and/or (f) take any other action allowed by law.

## 3.    SUSPENSION OF SERVICES AND/OR TERMINATION OF AGREEMENT

3.1    Suspension of Services and/or Termination of Agreement by the Law Firm. The Law Firm reserves the right to automatically and immediately suspend services or discontinue services, withdraw as your counsel, and terminate this agreement if (a) you persist in a course of action the Law Firm reasonably believes is criminal or fraudulent; (b) the Law Firm reasonably believes you have used its services to perpetrate a crime or fraud; (c) you persist upon pursuing an objective the Law Firm considers repugnant or imprudent; (d) you fail substantially to fulfill an obligation regarding the Law Firm's services to you, such as timely deposit or payment of fees; (e) the Law Firm's representation to you will result in an unreasonable financial burden on the Law Firm or has been rendered unreasonably difficult by you; or (f) other good cause exists for withdrawal. In the event the Law Firm suspends services or discontinues services for the reasons set forth above, you agree to hold the Law Firm harmless for any losses or damages you incur as a result of such suspension or discontinuance and termination. You further agree that you will not be entitled to any refund of fees previously paid, and that the Law Firm will have no further obligation to you.

3.2    Termination of Agreement by Client. You reserve the right to discontinue services and terminate this agreement at any time, provided you provide the Law Firm written notice of such discontinuance and termination. In the event you discontinue services for any reason, you agree to hold the Law Firm harmless for any losses or damages you incur as a result of such discontinuance or termination. You further understand and agree that you will not be entitled to any refund of fees previously paid, and that the Law Firm will have no further obligation to you. You further understand and agree that the Law Firm has to the right to collect its fees for all services rendered up to the date of your written discontinuance and termination. Should you desire to restart your case after discontinuance or termination; a new, separate written agreement must be signed.

## 4.    MISCELLANEOUS

4.1    Notices. All notices, demands and requests required or permitted to be given under Section 3 of this Agreement shall be in writing and shall be deemed given (a) when personally delivered to the party to be given such notice or other communication, (b) on the business day that such notice or other communication is sent by e-mail or facsimile or similar electronic device, fully prepaid, which facsimile or similar electronic communication shall promptly be confirmed by written notice, (c) on the third business day following the date of deposit in the United States mail if such notice or other

4

communication is sent by certified or registered air mail with return receipt requested and postage thereon fully prepaid, or (d) on the business day following the day such notice or other communication is sent by reputable overnight courier, to the addresses first written above, or such other address as designated by either party in writing after the date of this Agreement.

      **4.2**    <u>Representations and Guarantees.</u> You specifically agree that the Law Firm has not made oral or written representations or guarantees concerning the outcome of this matter, in whole or in part, and in fact, cannot provide an estimate of the final bill or guarantee certain results or objectives.

      **4.3**    <u>Bankruptcy.</u> In the event you intend to file bankruptcy at any time after the date of this Agreement, you shall provide written notice to the Law Firm at least thirty (30) days prior to filing bankruptcy and you shall provide the Law Firm with you Statement of Compliance with Credit Counseling as soon as it is issued. You further agree to sign and have notarized a valid reaffirmation agreement which shall state that you reaffirm the then current balance due to the Law Firm.

      **4.4**    <u>Further Assurances.</u> At any time or from time to time after the date of this Agreement, you agree, at the request of the Law Firm, to sign and deliver any further instruments or documents and take all such further action as the Law Firm may reasonably request to evidence the agreement contemplated hereby, including signing any mortgage, promissory note, security agreement, or reaffirmation agreement to secure payment of the fees due under this Agreement.

      **4.5**    <u>Benefit and Assignment.</u> This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective successors, assigns, heirs and legal representatives. Neither this Agreement nor any provisions hereof are intended to, or shall, create any rights in or confer any benefits to any person other than the parties hereto.

      **4.6**    <u>Entire Agreement, Amendments, and Assignment.</u> This Agreement is the entire agreement between the parties with respect to the transactions contemplated hereby and the matters set forth herein, and no prior or contemporaneous agreements, understandings, representations, or statements (oral or written) shall bind the parties. No change, modification, supplement, or addition to any part of this Agreement, including this paragraph, shall be binding on either party unless it is in writing and signed by both parties. Neither party may transfer, assign, or otherwise convey its rights or obligations under this Agreement without the written consent of the other party, and any attempt to transfer, assign, or otherwise convey any rights or obligations in violation of this paragraph shall be void.

      **4.7**    <u>Governing Law and Choice of Forum.</u> This Agreement shall deemed to be signed and agreed to in the state of Michigan and shall be construed and interpreted under and in accordance with laws of the State of Michigan. Any and all actions concerning any dispute arising under this Agreement shall be filed and maintained only in a state or federal court sitting in the State of Michigan. Venue shall be in Kalamazoo County, Michigan or Van Buren County, Michigan for any action brought with regard to this Agreement.

      **4.8**    <u>Waiver and Severability.</u> The waiver by either party of a violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provisions hereof. If any provision of this Agreement, or the application thereof shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to persons or circumstances, other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.



5

**4.9** <u>Headings and Terms</u>. Headings, in this agreement, are provided solely for the convenience of the parties and shall not be used to interpret or construe its provisions. Nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the person or persons, firm or corporation may in the context require.

**4.10** <u>Counterparts and Signatures</u>. This Agreement may be executed and delivered in any number of counterparts, all of which when executed and delivered shall have the force and effect of an original. A telecopied or e-mailed signature of a party shall stand as the original. Failure or refusal to sign by one party does not negate the effect of this Agreement for the other signing parties.

**4.11** <u>Authority</u>. . The parties executing this Agreement represent that they are duly authorized to execute this Agreement on behalf of themselves and/or their respective companies with the authority of its board of directors or similar governing body. Matthew Vestal and Mandy Vestal signs this agreement on behalf of Vestal Builders, LLC as the company officer or members and individually, jointly and severally.

**4.13** <u>Drafting</u>. You understand and acknowledge that this Agreement has been prepared by the Law Firm and establishes the rights of the Law Firm and you as a client. Due to any potential conflict of interest in drafting this agreement, the Law Firm hereby advises you that you have the right and opportunity to have this Agreement reviewed and revised by independent legal counsel of your choice. By signing this Agreement, you acknowledge that (a) you have had this Agreement reviewed by separate legal counsel and agree with the terms of this Agreement or you have chosen not to seek separate legal counsel; (b) you agree to waive any conflict of interest which may result by the Law Firm drafting this Agreement; and (c) none of the provisions of this Agreement shall be interpreted or construed against the Law Firm solely by virtue of the fact that any provision shall have been drafted by the Law Firm.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be effective as of the date first set forth above.

DePERNO LAW OFFICE, PLLC                          A&P ENTERPRISES OF MICHIGAN, LLC

By: _____                      By: _____
    Matthew S. DePerno                               Ronald Moffit
Its:  Member                                     Its:  Manager
Business Address:
    PO Box 536
    Mattawan, MI 49009                           By: _____
    269-668-4074                                     Cathleen Moffit
    msdesq@sbcglobal.net                         Its:  Manager


_____                          _____
Ronald Moffit, individually                      Cathleen Moffit, individually


_____              6           _____




LR-3251782
Page: 1 of 11
03/07/2013 04.31P
Van Buren Co. MI 800
NTG

L-1580 Pg-454



## FUTURE ADVANCE MORTGAGE

THIS IS A FUTURE ADVANCE MORTGAGE made March 4, 2013 between A&P ENTERPRISES OF MICHIGAN, LLC whose address is 555 Shady Lane, Decatur, MI 49045, hereinafter referred to as the "Mortgagor," and DePERNO LAW OFFICE, PLLC, whose address is PO Box 536, Mattawan, MI 49071, hereinafter referred to as the "Law Firm."

The Mortgagor represents, warrants, covenants, and agrees to and with the Law Firm that at all times this Mortgage is in effect:

1.  Liabilities. This Mortgage secures the following obligations to the Law Firm (hereinafter collectively referred to as the "Liabilities"):

(a)  Payment of loans, advances (including future advances) and/or other credit made or to be made by the Law Firm, including without limitation the amount due in the amount of $53,126.80 according to certain invoices and advances as of December 24, 2012, together with interest thereon at the rate of two (2%) percent and other sums owing or to become owing in connection therewith, and

(b)  ALL OTHER EXISTING AND FUTURE OBLIGATIONS OF MORTGAGOR TO THE LAW FIRM, WHETHER OR NOT SUCH OBLIGATIONS ARE INCLUDED ABOVE, including, but not limited to, (1) payment and performance of the provisions of this Mortgage; (2) payment of all advances (including future advances) made or to be made by the Law Firm; (3) payment and performance of all notes, undertakings, obligations, debts, liabilities, agreements, applications, guarantees, or promises of or by the Mortgagor to or with the Law Firm, whether due, existing or arising, now or in the future, absolute or contingent, direct or indirect, however arising or acquired by the Law Firm; (4) payment and performance of all existing and future obligations (including the kinds of obligations described above) to the Law Firm of any persons or entities for which the Mortgagor is or becomes an accommodation party, surety or guarantor or whose obligations this Mortgage is given to secure; and (5) all extensions, renewals and modifications of the foregoing. If more than one person, entity, or company appears as the Mortgagor above, the Liabilities shall include, without limitation, all of the foregoing joint, several, and individual obligations of each such person, entity, or company to the Law Firm. It is the intention of this mortgage to secure all attorney fees to the Law Firm and if the total aggregate fees are less than $53,126.80, the pay-off of the mortgage will be the total attorney fees owed at the conclusion of the services together with interest and other allowed charges. In the event the attorney fees exceed $53,126.80 because of additional services, the mortgage amount will increase to cover whatever attorney fees have been charged, plus interest and other allowed charges.

2.  Grant of Mortgage and Lien. In consideration of and to secure the Liabilities, the Mortgagor hereby mortgages and warrants to the Law Firm, its successors and assigns, the land, premises, and property situated in the following townships/cities, County of Van Buren, Michigan (the "Premises"), and more fully described as:

Mortgage – Page 1 of 11 – Initials: _R𝓜_ _Cm_



LR-3281782
Page: 2 of 11
03/07/2013 04:31P
Van Buren Co., MI ROD
RITG
**L—1580 Pg—454**

PARCEL No. 1.
    The South 165 feet of the North 495 feet of the Northeast quarter of Section 33, Town 3 South, Range 15 West, according to the Government Survey thereof.

        Commonly known as 68298 52ᵈ Street, Lawrence, MI 49064
        Tax Parcel No. 80-13-033-005-00

PARCEL No. 2.
    Parcel A: Part of the Northwest quarter of Section 34, Town 3 South, Range 15 West, described as beginning at the Northwest corner of said section 34; thence South 89 degrees 55 minutes 25 seconds East along the North line of said section 963.00 feet; thence South parallel to the West line of said section 226.00 feet; thence North 89 degrees 55 minutes 25 seconds West parallel to the North line of said section 963.00 feet to the West line of said section; thence North along said West line 226.00 feet to the point of beginning.

    Parcel B: Part of the Northwest quarter of Section 34, Town 3 South, Range 15 West, described as beginning at a point on the West line of said section 34 which is South 226.00 feet from the Northwest corner of said section; thence South 89 degrees 55 minutes 25 seconds East parallel to the North line of said section 963.00 feet; thence South parallel to the West line of said section 226.00 feet; thence North 89 degrees 55 minutes 25 seconds West parallel to the North line of said section 963.00 feet to the West line of said section; thence North along said West line 226.00 feet to the point of beginning.

        Commonly known as 68241 52ᵈ Street, Lawrence, MI 49064
        Tax Parcel No. 80-13-034-001-01

The Mortgagor also mortgages and warrants to the Law Firm: (a) all privileges, appurtenances, improvements, buildings, tenements, hereditaments, easements, rights of way, licenses, permits, riparian and littoral rights, mineral/oil/gas/water rights, rights to adjoining land, and all other rights belonging to the Premises and which may hereafter attach thereto; (b) all rights to make divisions of the Premises that are exempt from the platting requirements of the Michigan Land Division Act, as it shall be amended; (c) all rents, issues, profits, revenues, proceeds, accounts and general intangibles arising from or relating to the Premises or any business conducted thereon by the Mortgagor including, without limitation, all rights conferred by Act No. 210 of Michigan Public Acts of 1953, as amended (collectively the "Rents and Accounts"); (d) all equipment, other goods, and fixtures of every kind and nature whatsoever, now or hereafter located in or upon the Premises or any part thereof and used or useable in connection with any present or future operation of such premises (hereinafter called "Equipment and Fixtures"), whether now owned or hereafter acquired by the Mortgagor, including, without limitation, all heating, air conditioning, ventilation, lighting, incinerating and power equipment, engines, signs, security systems, fences, hoists, cranes, compressors, pipes, pumps, tanks, motors, plumbing, cleaning, fire prevention, tire extinguishing, apparatus, elevators, escalators, shades, awnings, screens, storm doom and windows, appliances, attached cabinets, partitions, carpeting, ground maintenance equipment, and similar types of equipment, all of which shall be deemed to be real estate and mortgaged hereby; (e) all "as-extracted collateral" related to the Premises; and (f) all awards or payments, and interest on them, made with respect to the Premises as a result of (i) any eminent domain proceeding, (ii) any street grade alteration, (iii) any loss of or damage to any building or other improvement, (iv) any other injury to or decrease in the value of the Premises, (v) any refund due on account of the payment of real estate taxes, assessments or other charges levied against the Premises or (vi) any refund of utility deposits or right to any tenant deposit. This Mortgage shall also constitute: a security agreement with reference to the Equipment and Fixtures, as-extracted collateral and Rents and Accounts and all proceeds thereof; a fixture filing; and a Financing Statement covering as-extracted collateral.

        Mortgage – Page 2 of 11 – Initials: _RM CM_



LR-3261792
Pages 3 of 11
03/07/2013 04:31P
Van Buren Co. MI ROD
RTC

**L-1580 Pg-454**

All of the above described Premises, Equipment and Fixtures, Rents and Accounts, and other property and rights related thereto are collectively referred to herein as the "Property".

3.    Payment and Performance of Obligations. The Mortgagor shall pay the Liabilities in accordance with the terms thereof and shall keep and perform all the terms, conditions and covenants of the Liabilities. The Liabilities includes a line of credit for fees. Although the Liabilities may be reduced to a zero balance, this Mortgage will remain in effect until released.

4.    Title to Property/Priority of Lien. The Mortgagor does and shall own good and marketable title to the Property, free of all easements, liens, mortgages, security interests, encroachments, encumbrances, leasehold interests, rights, claims, and other Interests of any nature (herein "Interests"), other than Interests which are consented to in writing by the Law Firm. The Mortgagor shall forever warrant and defend the Property against any and all Interests not consented to in writing by the Law Firm and the lien created hereby is and shall be kept as a first lien upon the Property, unless otherwise agreed in writing by the Law Firm. The Mortgagor shall pay when due all obligations which, if unpaid, would become a lien on the Property. Upon request, the Mortgagor shall, at its cost, provide the Law Firm with a title insurance policy and other evidence of title as the Law Firm may request from time to time which shall be in form and substance satisfactory to the Law Firm. With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees to make all payments when due and to perform or comply with all covenants. Mortgagor also agrees not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without the Law Firm's prior written approval.

5.    Claim Against Title. Mortgagor will pay all taxes, assessments, debts, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. The Law Firm may require Mortgagor to provide the Law Firm copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Mortgage. Mortgagor agrees to assign to Lender, as requested by the Law Firm, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

6.    Condition, Maintenance and Use of the Property. The Property is and shall be in good condition sufficient for the use contemplated by the Mortgagor, and free of all material defects. None of the easements, rights, or other Interests consented to by the Law Firm shall materially impair or restrict the use of the Property as contemplated by the Mortgagor. The Mortgagor shall not commit, now or hereafter, waste on the Property and shall maintain all of the Property in good condition and working order satisfactory to the Law Firm, and shall make all repairs and replace all Equipment and Fixtures necessary to maintain the utility and value of the Property and keep it in compliance with all applicable laws, regulations, and ordinances. The Mortgagor shall do everything necessary to keep in force any manufacturer's and seller's warranties with respect to the Equipment and Fixtures. The Mortgagor shall hold all valid permits and licenses necessary to operate and maintain the Property as contemplated by the Mortgagor and the Property shall be used only for lawful purposes and in compliance with all applicable laws, regulations and ordinances. The Mortgagor shall promptly repair, restore, replace or rebuild each part of the Property which may be damaged or destroyed by fire or other casualty or which may be affected by any eminent domain proceedings, notwithstanding application by the Law Firm of the insurance proceeds or eminent domain award to payment of the Liabilities.

7.    Payment of Taxes. The Mortgagor shall pay and discharge all taxes, assessments, fees, licenses, liens, and charges at any time levied upon or assessed against the Mortgagor or the Property. The

Mortgage – Page 3 of 11 – Initials: _R 'N_ _CM_

LR-3261792
Page: 4 of 11
03/07/2013 04:31P
Van Buren Co. BI ROD
RTC

**L-1580 Pg-454**

Mortgagor shall not do anything or permit anything to be done which would impair the lien of this Mortgage. Notwithstanding the foregoing, the Mortgagor shall not be required to pay any tax, assessment, fee, license, lien, or charge so long as it is in good faith contesting the validity thereof. If such contest is made, the Mortgagor shall provide security for the payment of such tax, assessment, fee, license, lien, or charge in a manner satisfactory to the Law Firm.

8.    Insurance. The Mortgagor shall carry insurance against such risks, with such companies, and in such amounts as shall be satisfactory to the Law Firm (including but not limited to, hazard insurance and flood insurance, if the Property is located within a flood hazard area); each policy shall be in a form satisfactory to the Law Firm with standard mortgagee clauses making all loss payable to the Law Firm as secondary insured. The Mortgagor shall promptly pay all premiums therefor, and deliver to the Law Firm all such policies of insurance. All insurance policies shall provide that notice of non-renewal or cancellation must be given to the Law Firm at least thirty (30) days before such non-renewal or cancellation. Any insurance money received by the Law Firm may, at its sole election, be paid, either in whole or in part, to the Mortgagor for the purpose of defraying the costs and expenses of repair, restoration or replacement of the Property damaged or destroyed, or be retained and applied toward the payment of any of the Liabilities, in whatever order the Law Firm shall elect, with the excess, if any, over the Liabilities to be repaid to the Mortgagor, without impairing the Mortgagor's duties under this Mortgage or the Liabilities. In the event of loss with respect to the Property, the Mortgagor shall promptly notify the Law Firm thereof and the Law Firm may make any proof of loss not promptly made by the Mortgagor, in the event of foreclosure or other disposition of the Property in partial or full payment of the Liabilities, the Law Firm shall be entitled to all of the Mortgagor's right, title and interest in and to all policies of insurance with respect to the Property, including, without limitation, the right to collect any unearned premium refund relating to such policies.

9.    Removal of the Property. Except for maintenance in the ordinary course of business, the Mortgagor shall not, without the prior written consent of the Law Firm materially alter, remove or demolish any timber, topsoil, minerals, fixture, building, or improvement forming part of the Property.

10.    Transfer of the Property. The Law Firm is relying upon the integrity of the Mortgagor and its promises to perform the covenants of this Mortgage. The Mortgagor shall not sell, transfer, convey, assign, rent for a period exceeding one year, dispose of, or further encumber, voluntarily or involuntarily, its interest in any of the Property by deed, land contract, mortgage or otherwise, without the prior written consent of the Law Firm. Subject to the foregoing, if the ownership of the Property, or any part thereof, becomes vested in a person other than the Mortgagor, the Law Firm may deal with such successor or successors in interest in the same manner as with the Mortgagor, without in any manner vitiating or discharging the Mortgagor's liability hereunder or upon the Liabilities. The Mortgagor shall at all times continue to be primarily liable on the Liabilities until fully discharged or until the Mortgagor is formally released in writing by the Law Firm.

11.    Additional Documents. At any time, upon request of the Law Firm, the Mortgagor shall execute and deliver or cause to be executed and delivered to the Law Firm and, where appropriate, shall cause to be recorded and/or filed at such time and in such offices and places designated by the Law Firm any and all such other and further mortgages, financing statements, instruments of further assurance, certificates and other documents as may, in the opinion of the Law Firm or its counsel, be necessary or desirable to effectuate, complete, perfect, continue or preserve the obligation of the Mortgagor under this Mortgage, and the lien of this Mortgage as a first lien upon all the Property (excepting prior liens consented to in writing by the Law Firm). If the Mortgagor fails to comply with the foregoing sentence, the Law Firm may execute, record, file, re-record and refile any and all such mortgages, financing statements, instruments, certificates and documents for and in the name of the Mortgagor and the Mortgagor hereby irrevocably appoints the Law Firm as its agent and attorney in fact to do so.

Mortgage – Page 4 of 11 – Initials: _____



LR-3261792
Page: 5 of 11
03/07/2013 84:31P
Van Buren Co, MI RОD
HTG

L-1580 Pg-454

12. **Authority to Perform**. If Mortgagor fails to perform any duty or any of the covenants contained in this Mortgage, the Law Firm may, without notice, perform or cause them to be performed. Mortgagor appoints the Law Firm as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. The Law Firm's right to perform for Mortgagor shall not create an obligation to perform, and the Law Firm's failure to perform will not preclude the Law Firm from exercising any of the Law Firm's other rights under the law or this Mortgage.

13. **Leaseholds; Condominiums; Planned Unit Developments**. Mortgagor agrees to comply with the provisions of any lease if this Mortgage is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Mortgagor will perform all of Mortgagor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

14. **Condemnation**. Mortgagor will give the Law Firm prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes the Law Firm to intervene in Mortgagor's name in any of the above described actions or claims. Mortgagor assigns to the Law Firm the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Mortgage. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

15. **Waste and Receiver**. The failure, refusal or neglect of the Mortgagor to pay any of the taxes assessed against the Property before any interest or penalty attaches thereto and to provide adequate security therefor shall constitute waste hereunder and in accordance with the provisions of Act No. 236 of the Public Acts of Michigan for 1961. The failure, refusal or neglect of the Mortgagor to keep the Property adequately insured as herein provided, or to pay the premiums therefor, shall likewise constitute waste hereunder and in accordance with the provisions of Act No. 236. Upon the happening of any act of waste and on proper application made therefor by the Law Firm to a court of competent jurisdiction, the Law Firm shall forthwith be entitled to the appointment of a receiver of the Property and of the earnings, income, issue and profits thereof, with such powers as the court making such appointment shall confer. The Mortgagor hereby irrevocably consents to such appointment and waives notice of any application therefor.

16. **Reimbursement of Expenses**. The Mortgagor shall pay or reimburse the Law Firm for expenses reasonably necessary or incidental to the protection of the lien and priority of this Mortgage and for expenses incurred by the Law Firm in seeking to enforce the provisions hereof and of the Liabilities (whether before or after default, through formal or informal collection actions, workout or otherwise), including but not limited to costs of evidence of title to and survey of the Property, costs of recording this and other instruments, actual, reasonable attorney fees (including, but not limited to, fees incurred in participating or taking action in any bankruptcy or other insolvency proceeding of Mortgagor), trustees' fees, court costs, and expenses of advertising, selling and conveying the Property. All such payments or reimbursements shall be paid immediately to the Law Firm, shall be added to the Liabilities, shall be secured by this Mortgage, and shall bear interest at the highest rate specified in the Liabilities from the date incurred by the Law Firm until fully paid.

17. **Inspection and Reports**. At all reasonable times, the Law Firm and its agents may inspect the Property to ascertain whether the covenants and agreements contained herein or in any supplementary agreement are being performed. Upon demand by the Law Firm, the Mortgagor shall promptly deliver to the Law Firm all financial reports, statements, rent rolls and other documents relating to the Property and the Mortgagor, as shall be reasonably requested by the Law Firm. Mortgagor hereby authorizes the Law

Mortgage – Page 5 of 11 – Initials:



LR-3261792
Page: 6 of 11
03/07/2013 04:31P
Van Buren Co, MI ROD
MTG

**L-1580 Pg-454**

Firm to undertake or to have third parties undertake on its behalf (not more often than twice in any 12 month period) environmental investigations regarding the Property and its operation including research into the previous and current ownership, use, and condition (by taking samples or borings or otherwise) of the Property for the purpose of attempting to determine whether: (i) Mortgagor or any current or past occupant of the Property has violated any federal, state or local laws involving the protection of the environment and/or the disposition of or exposure to hazardous or toxic substances as now existing or as hereinafter amended or enacted, or any rules regulations, guidelines or standards promulgated pursuant thereto; and (ii) whether any hazardous or toxic substances have been used or disposed of on the Property. Such investigations may be performed at any time before or after occurrence of an Event of Default and Mortgagor will permit the Law Firm and persons acting on its behalf to have access to the Property and records concerning the Property for the purpose of conducting such investigations. The cost of all such investigations shall be immediately paid by Mortgagor to the Law Firm, and if not paid, shall be added to the Liabilities secured hereby and shall bear interest at the highest rate specified in any of the Liabilities secured hereby from the date incurred by the Law Firm until paid.

18.    Events of Default. Occurrence of any one of the following events shall constitute an "Event of Default" under this Mortgage" (a) breach failure of payment or performance or default by the Mortgagor of or under any of the terms conditions or covenants of this Mortgage any of the Liabilities, or any other instrument or agreement executed by the Mortgagor with or in favor of the Law Firm; (b) breach, failure of payment or performance, or default by any obligor other than the Mortgagor of or under any of the terms, conditions or covenants of any of the Liabilities for which this Mortgage is given as security, or of any other instrument or agreement executed by such obligor with or in favor of the Law Firm; (c) the Mortgagor makes an assignment for the benefit of creditors, or a receiver, liquidator, or trustee is appointed for the Mortgagor or any of its property; (d) any proceeding under any insolvency or bankruptcy law is instituted by or against the Mortgagor or any action is taken to realize upon or any proceeding is instituted to foreclose any mortgage, security interest, or lien of any kind against the Property, (e) any default in the terms, conditions or covenants of any mortgage, lease, land contract, easement or other instrument winch evidences an interest in the Property by any third party, (f) any representation, warranty, financial statement report or other information made or furnished by or on behalf of the Mortgagor to the Law Firm at any time proves to be, or to have been, false or materially misleading when made or furnished and/or (g) any substantial damage or destruction to the Property or the issuance or filing of any attachment levy, garnishment or other judicial protest or proceeding upon or its respect of the Mortgagor or the Property.

19.    The Law Firm's Rights Upon Default. Upon occurrence of an Event of Default all of the Liabilities (regardless of any contrary terms thereof) shall, at the option of the Law Firm, be immediately due and payable without demand or notice, and the Law Firm may take any one or more of the following actions not contrary to law: (a) foreclose this Mortgage by legal proceedings or advertisement and collect its actual attorney fees as awarded by the Court; (b) sell, grant, and convey the Property, or cause the Property to be sold, granted and conveyed at public sale and to execute and deliver to the purchaser at such sale a good and sufficient deed or deeds of conveyance at law, pursuant to the statute in such case made and provided and out of the proceeds of such sale to retain the sums due under this Mortgage and all costs and charges of the sale (including, without limitation, the attorney fees provided by statute), rendering the surplus moneys, if any, to the Mortgagor or as otherwise provided by law, and in the event of a public sale and unless otherwise prohibited by law, the Property may be sold at one or more parcels, the Law Firm may sell the Property for cash and/or secured credit, and the Law Firm may give a warranty deed to the purchaser binding upon the Mortgagor and all claiming under the Mortgagor; (c) as to the Equipment and Fixtures and Rents and Accounts, exercise any of the rights and remedies of a creditor under the Uniform Commercial Code, any other law, and any Court Rule; (d) enter upon the Property and take other actions as the Law Firm deems appropriate to perform the Mortgagor's obligations under this Mortgage, to inspect, repair, protect or preserve the Property, to investigate or test for the presence of any

Mortgage – Page 6 of 11 – Initials: _R. J. Con_



LR-3261792
Page: 7 of 11
03/07/2013 04:31P
Van Buren Co., MI RDO
HTC
**L-1580 Pg-454**

hazardous materials, and/or to appraise the Property, each of the rights under this subparagraph being specifically enforceable since there is not adequate monetary remedy available to the Law Firm, (e) exercise any and all rights granted to the Law Firm herein or in any of the Liabilities; and/or (f) take any other action allowed by law. Acceleration of the Liabilities as provided in this Mortgage shall trigger any applicable prepayment premium or formula. Without limiting when a prepayment premium may be due, it is agreed that, at any time after acceleration, a tender of payment of the amount necessary to satisfy the entire Liabilities by or on behalf of the Mortgagor or otherwise, must include any applicable prepayment premium or formula

20.    Application of Payments After Default. Notwithstanding anything to the contrary contained in this Mortgage or its any of the Liabilities, upon occurrence of an Event of Default under this Mortgage, any proceeds of any foreclosure, voluntary sale, or other disposition of the Property shall be applied by the Law Firm to reduction of the Liabilities in such order as the Law Firm shall determine in its sole judgment and the Mortgagor shall have no right to require the Law Firm to apply such proceeds to any specific Liabilities.

21.    Subrogation. Any transferee of, or endorser, guarantor or surety or other party providing security who pays the Liabilities secured hereby in full may take over all or any part of the Property and shall succeed to all rights of the Law Firm in respect thereto and the Law Firm shall be under no further responsibility therefor. No party shall succeed to any of the rights of the Law Firm so long as any of the Liabilities remain unpaid to the Law Firm.

22.    Release of Security. The Mortgagor agrees that the Law Firm may, without impairing the obligation of the Mortgagor hereunder: release any other obligors or guarantors from their obligations to pay or perform the Liabilities; release any security of any obligor or guarantor of the Liabilities before or after maturity of any of the Liabilities; take, release or enforce its rights with respect to any of the Property without being obliged first to do so to any other security, whether owned by the Mortgagor or any other person; and agree with any obligor of the Liabilities to extend, modify, forbear or make any accommodations with regard to the terms of the Liabilities owed by such obligor.

23.    **WAIVER OF RIGHTS REGARDING SALE BY ADVERTISEMENT. WARNING: THIS MORTGAGE CONTAINS A POWER OF SALE AND UPON DEFAULT MAY BE FORECLOSED BY ADVERTISEMENT. IN FORECLOSURE BY ADVERTISEMENT AND THE RELATED SALE OF THE PREMISES, NO HEARING IS REQUIRED AND THE ONLY NOTICE REQUIRED IS TO PUBLISH NOTICE IN A LOCAL NEWSPAPER AND TO POST A COPY OF THE NOTICE ON THE PREMISES. MORTGAGOR WAIVES ALL RIGHTS UNDER THE CONSTITUTION AND LAWS OF THE UNITED STATES AND THE STATE OF MICHIGAN TO A HEARING PRIOR TO SALE IN CONNECTION WITH FORECLOSURE BY ADVERTISEMENT AND ALL NOTICE REQUIREMENTS EXCEPT AS SET FORTH IN THE MICHIGAN STATUTE PROVIDING FOR FORECLOSURE BY ADVERTISEMENT.**

24.    Environmental Laws. The Mortgagor represents and covenants the following with respect to all Environmental Laws and Hazardous Materials (both as later defined):

(a)    that the Mortgagor has not used Hazardous Materials on or affecting the Premises in any manner which violates Environmental Laws (as later defined), that there is no condition concerning the Premises which could require remediation pursuant to Environmental Laws, and that, to the best of the Mortgagor's knowledge, no prior owner of the Premises or any current or prior occupant has used Hazardous Materials on or affecting the Premises in any manner which violates Environmental Laws. The Mortgagor covenants and agrees that neither is nor any

Mortgage – Page 7 of 11 – Initials: R M



LR-3261702
Page: 8 of 11
03/07/2013 04:31P
Van Buren Co. MI ROD
MTS

L-1580 Pg-454

occupant shall use, introduce or maintain Hazardous Materials on the Premises unless done in strict compliance with all Environmental Laws;

(b)      the Mortgagor shall conduct and complete all investigations, environmental audits, studies, sampling and testing, and all remedial, removal and other actions necessary to clean up and remove all Hazardous Materials on or affecting the Premises, whether caused by the Mortgagor or a third party, in accordance with all Environmental Laws to the satisfaction of the Law Firm, and in accordance with the orders and directives of all federal, state and local governmental authorities, and the Mortgagor shall notify the Law Firm in writing prior to taking, and continually after that of the status of, all such actions. The Mortgagor shall, promptly upon the Law Firm's request, provide the Law Firm with copies of the results of all such actions and all related documents and information. Any remedial, removal or other action by the Mortgagor shall not be deemed a cure or waiver of any breach of this paragraph due to the presence or use of Hazardous Materials on or affecting the Premises. Additionally, the Mortgagor shall defend, indemnify and hold harmless the Law Firm, its employees, agents, shareholders, members, officers and directors, from and against any and all claims, demands, penalties, fines, liabilities, settlements, damages, costs or expenses (including, without limit, attorney fees) of whatever kind arising out of or related to (i) the presence, disposal, release or threatened release of any Hazardous Materials on, from or affecting the Premises or the soil, water, air, vegetation, buildings, personal property, persons or animals on the Premises, (ii) any personal injury (including, without limit, wrongful death) or property damage (real or personal) arising out of or related to these Hazardous Materials, (iii) any lawsuit brought or threatened, settlement reached or government order related to these Hazardous Materials, (iv) the cost of removal of Hazardous Materials from any portion of the Premises, (v) taking necessary precautions to protect against the release of Hazardous Materials on or affecting the Premises, (vi) complying with all Environmental Laws and/or (vii) any violation of Environmental Laws or requirements of the Law Firm, which are in any way related to Hazardous Materials including, without limit, attorneys and consultants' fees (the attorneys and consultants to be selected by The Law Firm), investigation and laboratory fees and environmental studies required by the Law Firm (whether prior to foreclosure, or otherwise). Upon the request of the Law Firm, the Mortgagor and any guarantor shall execute a separate indemnity consistent with this paragraph;

(c)      the Mortgagor has never received any notice ("Environmental Complaint") of any potential violation of Environmental Laws with respect to the Mortgagor or the Premises (and, within five (5) days of receipt of any Environmental Complaint, the Mortgagor shall give the Law Firm a copy of is), and to the best of the Mortgagor's knowledge, there have been no actions commenced or threatened by any party with respect to the Mortgagor or the Premises for noncompliance with any Environmental Laws;

(d)      in the event this Mortgage is foreclosed or the Mortgagor tenders a deed in lieu of foreclosure, the Mortgagor shall deliver the Premises to the Law Firm, purchaser or grantee, as the case may be, free of Hazardous Materials so that the condition of the Premises shall not be a violation of any Environmental Laws.

(e)      upon ten (10) days' notice to the Mortgagor (except in an emergency or where not practical under applicable law, in which case notice is waived), and without limitation of the Law Firm's other rights under this Mortgage or elsewhere, the Law Firm has the right, but not the obligation, to enter on the Premises and to take those actions as it deems appropriate to investigate or test for, clean up, remove, resolve, minimize the impact of or advise governmental agencies of the possible existence of any Hazardous Materials upon the Law Firm's receipt of any notice from any source asserting the existence of any Hazardous Materials or an Environmental

Mortgage – Page 8 of 11 – Initials: _R W_

LR-3251732
Page: 9 of 11
03/07/2013 04:31P
Van Buren Co., MI ROD
RTC

**L-1580 Pg-454**

Complaint pertaining to the Premises which, if true, could result in an order, suit or other action against the Mortgagor or any part of the Premises which, in the sole opinion of the Law Firm, could jeopardize its security under this Mortgage. Any such actions conducted by the Law Firm shall be solely for the benefit of and to protect the interests of the Law Firm and shall not be relied upon by Mortgagor or any third party for any purpose. By conducting any such actions, the Law Firm does not assume control over the environmental affairs or operations of the Mortgagor nor assume any liability of the Mortgagor or any third party.

(f)     the provisions of this paragraph shall be in addition to all other obligations and liabilities the Mortgagor may have to the Law Firm at common law or pursuant to any other agreement, and shall survive (i) the repayment of she indebtedness, (ii) the satisfaction of all other obligations of the Mortgagor under this Mortgage and under the other loan documents, (iii) the discharge of this Mortgage, and (iv) the foreclosure of this Mortgage or acceptance of a deed in lieu of foreclosure. For purposes of this Mortgage, (i) "Hazardous Materials" means each and all of the following: hazardous materials and/or substances as defined in any Environmental Law, asbestos, petroleum, petroleum by-products, natural gas, flammable explosives, radioactive materials, and toxic materials, and (ii) "Environmental Laws" mean any and all federal, state, local or other laws (whether under common law, by legislative action or otherwise), rules, policies, ordinances directives, orders statutes or regulations an object of which is to regulate or improve health, safety, or the environment.

25.     Waiver of Marshaling. In the event of foreclosure of this Mortgage or the enforcement by the Law Firm of any other rights and remedies under this Mortgage, the Mortgagor waives any right otherwise available in respect to marshaling of assets which secure the Liabilities or to require the Law Firm to pursue its remedies against any other assets or any other party which may be liable for any of the Liabilities.

26.     Reinstatement of Mortgage. If any payment to the Law Firm on any of the Liabilities is wholly or partially invalidated, set aside, declared fraudulent, or required to be repaid to the Mortgagor or anyone representing the Mortgagor or the Mortgagor's creditors under any bankruptcy or insolvency act or code, tender any state or federal law, or any common law or equitable principles, then this Mortgage shall remain in full force and effect or be reinstated, as the case may be, until payment in full to the Law Firm of the repaid amounts, and of the Liabilities. If this Mortgage must be reinstated, the Mortgagor agrees to execute and deliver to the Law Firm new mortgages, if necessary, in form and substance acceptable to the Law Firm, covering the Property.

27.     Payments Set Aside. If any payment applied by the Law Firm to the Liabilities is subsequently set aside, recovered, rescinded, or otherwise required to be returned or disgorged by the Law Firm for any reason (pursuant to bankruptcy proceedings, fraudulent conveyance statutes, or otherwise), the Liabilities to which the payment was applied shall for the purposes of this Mortgage be deemed to have continued in existence, notwithstanding the application, and shall be secured by this Mortgage as fully as if the Law Firm had not received and applied the payment.

28.     Joint and Several Obligations. If two or more persons execute this Mortgage as the Mortgagor, the obligations and grants of liens of such persons herein shall be joint, several, and individual, even if the signatory signs this Mortgage on one signature block for all related companies, entities, trust, and the individual. All persons signing this Mortgage on behalf of a corporation, partnership, trust or other entity warrant to the Law Firm that they are duly and properly authorized to execute this Mortgage. Ronald Moffit and Cathleen Moffit agrees and acknowledges that they are signing this mortgage as the duly authorized representative of A&P Enterprises of Michigan, LLC and that they are jointly and severally liable for the Liabilities and covenants and mortgages contained herein. Ronald

Mortgage – Page 9 of 11 – Initials: _____



LR-3251792
Page: 10 of 11
03/07/2013 04:31P
Van Buren Co., MI ROD
MTC

**L-1580 Pg-454**

Moffit and Cathleen Moffit further acknowledge that they are in fact the managers of A&P Enterprises of Michigan, LLC and are duly authorized to sign this agreement on behalf of A&P Enterprises of Michigan, LLC with the authority of the board of directors or similar governing body.

29.     Benefit and Assignment. This Mortgage shall inure to the benefit of the Law Firm, its representatives and assigns, and shall be binding upon the Mortgagor, its representatives, successors, and assigns. The Law Firm may assign (or sell participations) in the Liabilities and any reference to the Law Firm shall include any holder of the Liabilities and any holder shall succeed to the Law Firm's rights under this Mortgage.

30.     Notice. Notice from the Law Firm to the Mortgagor, if mailed, shall be deemed given when mailed to the Mortgagor, postage prepaid, at the Mortgagor's address act forth as the beginning of this Mortgage or at any other address of the Mortgagor in the records of the Law Firm.

31.     Waiver. Nothing in this Mortgage shall waive or restrict any right of the Law Firm granted in any other document or by law. No delay on the part of the Law Firm in the exercise of any right or remedy shall operate as a waiver. No single or partial exercise by the Law Firm of any right or remedy shell preclude any other future exercise of that right or remedy or the exercise of any other right or remedy. No waiver or indulgence by the Law Firm of any default shall be effective unless in writing and signed by the Law Firm, nor shall a waiver on one occasion be construed as a bar to or waiver of that right on any future occasion. Acceptance of partial or late payments owing on any of the Liabilities at any time shall not be deemed a waiver of any default.

32.     Severability. Whenever possible, each provision of this Mortgage shall be interpreted in such manner as to be effective and valid under applicable law. If any provision hereof shall be declared invalid or illegal it shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of the provision or the remaining provisions of this Mortgage.

33.     Cumulative Rights. All rights, remedies and security granted to the Law Firm herein are cumulative and in addition to other rights, remedies or security which may be granted elsewhere or by law. Any inspection, audit, appraisal or examination of the Property by or on behalf of the Law Firm shall be solely for its benefit and shall not create any duty or obligation to the Mortgagor or any other person.

34.     Headings and Terms. Headings, in this Mortgage, are provided solely for the convenience of the parties and shall not be used to interpret or construe its provisions. Nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the person or persons, firm, or corporation may in the context require.

35.     WAIVER OF JURY TRIAL. MORTGAGOR AND THE LAW FIRM EACH HEREBY KNOWINGLY AND VOLUNTARILY, WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES BETWEEN THEM ARISING OUT OF THIS MORTGAGE, ANY OF THE LIABILITIES, OR ANY ALLEGED ACT OR NEGLECT OF THE LAW FIRM.

36.     Drafting/Waiver of Conflict. This Mortgage has been prepared by participation of both Mortgagor and the Law Firm. Due to any potential conflict of interest in this Mortgage, the Mortgagor acknowledges that (a) Mortgagor has had this Mortgage reviewed by separate legal counsel and agrees with the terms of this Agreement or has chosen not to seek separate legal counsel; (b) Mortgagor agrees to waive any conflict of interest which may result by the preparation of this Mortgage; and (c) none of the provisions of this Mortgage shall be interpreted or construed against either the Law Firm or the Mortgagor solely by virtue of their participation in drafting this Mortgage.

Mortgage – Page 10 of 11 – Initials: _____



LR-3261792
Page: 11 of 11
03/07/2013 04:31P
Van Buren Co., MI ROD
MTG

L-1580 Pg-454

IN WITNESS WHEREOF, the Mortgagor has executed this Mortgage on the day and year first above written.

A&P ENTERPRISES OF MICHIGAN, LLC

Dated: March 4, 2013

By: _____
Ronald Moffit
Its: Manager

Dated: March 4, 2013

By: _____
Cathleen Moffit
Its: Manager

STATE OF MICHIGAN    )
                     ) ss.
COUNTY OF KALAMAZOO  )

On this 5th day of March, 2013, before me, a Notary Public, in and for said County, appeared Ronald Moffit and Cathleen Moffit, as managers of A&P Enterprises of Michigan, LLC, who being by me duly sworn, and that he executed the within instrument, and that said instrument was signed and acknowledged to be his free act and deed on behalf of A&P Enterprises of Michigan, LLC.

_____
Kimberly M. Sova, Notary Public
Kalamazoo County, Michigan
My Commission Expires: 11/3/2019

Document Prepared By and When Recorded Return to:

Matthew S. DePerno
DePerno Law Office, PLLC
PO Box 536
Mattawan, MI 49071

Mortgage – Page 11 of 11 – Initials: RM CM

**DePERNO LAW OFFICE, PLLC**
Attorneys
8175 Creekside Drive, Suite 240
Portage, MI 49024

<u>NOTICE OF MORTGAGE FORECLOSURE AND SALE</u>

68241 52nd Street, Lawrence, MI 49064

THIS FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE. PLEASE CONTACT OUR OFFICE AT THE NUMBER BELOW IF YOU ARE IN ACTIVE MILITARY DUTY.

ATTN PURCHASERS. This sale may be rescinded by the foreclosing mortgagee. In that event, your damages, if any, shall be limited solely to the return of the bid amount tendered at sale, plus interest.

MORTGAGE SALE – Default has occurred in the conditions of a mortgage (the "Mortgage") made by A&P ENTERPRISES OF MICHIGAN, LLC, mortgagor, to DePERNO LAW OFFICE, PLLC, a Michigan professional limited liability company, having its principal offices at 8175 Creekside Drive, Suite 240, Portage, Michigan, mortgagee, dated March 4, 2013, and recorded in the Office of the Register of Deeds of Van Buren County, Michigan on March 7, 2013 at Liber 1580, Page 454, and modified on September 10, 2013 at Liber 1591, Page 369. Because of the default, the undersigned has elected to declare the entire unpaid amount of the Mortgage immediately due and payable.

At the date of this notice there is hereby claimed to be due for principle and interest on the Mortgage the sum of One Hundred Forty One Thousand Four Hundred Thirty One and 46/100 Dollars ($141,431.46). No suit or proceedings at law have been instituted to recover any part of the debt secured by the Mortgage.

Notice is hereby given that by virtue of the power of sale contained in the Mortgage and the statute in such case made and provided, and to pay said amount with interest as provided in the Mortgage, and all legal costs, charges, and expenses, including attorney fees allowed by law, the Mortgage will be foreclosed by sale of the mortgaged premises at public venue to the highest bidder at the place of holding the Circuit Court within Van Buren County, on THURSDAY, MARCH 27, 2014 at 1:00 PM local time.

The premises covered by said mortgage are situated in the Township of Lawrence, Van Buren County, Michigan and are described as:

> Parcel A: Part of the Northwest quarter of Section 34, Town 3 South, Range 15 West, described as beginning at the Northwest corner of said section 34; thence South 89 degrees 55 minutes 25 seconds East along the North line of said section 963.00 feet; thence South parallel to the West line of said section 226.00 feet; thence North 89 degrees 55 minutes 25 seconds West parallel to the North line of said section 963.00 feet to the West line of said section; thence North along said West line 226.00 feet to the point of beginning.

> Parcel B: Part of the Northwest quarter of Section 34, Town 3 South, Range 15 West, described as beginning at a point on the West line of said section 34 which is South 226.00 feet from the Northwest corner of said section; thence South 89 degrees 55 minutes 25 seconds East parallel to the North line of said section 963.00 feet; thence South parallel to the West line of said section 226.00 feet; thence North 89 degrees 55 minutes 25 seconds West parallel to the North line of said section 963.00 feet to the West line of said section; thence North along said West line 226.00 feet to the point of beginning.

Commonly known as 68241 52nd Street, Lawrence, MI 49064

Tax Parcel No. 80-13-034-001-01

Pursuant to Section 3240(7) of the Revised Judicature Act of 1961, as amended (MCLA 600.3240(7); MSA 27A.3240(7)), the redemption period shall be six (6) months from the date of the foreclosure sale, unless the premises are determined to be abandoned in accordance with MCLA 600.3241a; MSA 27A.3241a, in which case the redemption period shall be thirty (30) days from the date of such sale.

If the property is sold at foreclosure sale under Chapter 32 of the Revised Judicature Act of 1961, pursuant to MCL 600.3278 the borrower will be held responsible to the person who buys the property at the mortgage foreclosure sale or to the mortgage holder for damaging the property during the redemption period.

Dated: February 26, 2014

For more information call:
269-321-5064
DePerno Law Office, PLLC
8175 Creekside Drive, Suite 240
Portage, MI 49024

**NOTICE OF MORTGAGE FORCLOSURE AND SALE**
**68241 52nd Street, Lawrence, MI 49064**

**THIS FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE. PLEASE CONTACT OUR OFFICE AT THE NUMBER BELOW IF YOU ARE IN ACTIVE MILITARY DUTY.**

ATTN PURCHASERS: This sale may be rescinded by the foreclosing mortgagee. In that event, your damages, if any, shall be limited solely to the return of the bid amount tendered at sale, plus interest.

MORTGAGE SALE - Default has occurred in the conditions of a mortgage (the "Mortgage") made by A&P ENTERPRISES OF MICHIGAN, LLC, mortgagor, to DePERNO LAW OFFICE, PLLC, a Michigan professional limited liability company, having its principal offices at 8176 Creekside Drive, Suite 240, Portage, Michigan, mortgagee, dated March 4, 2013, and recorded in the Office of the Register of Deeds of Van Buren County, Michigan on March 7, 2013, at Liber 1580, Page 454, and modified on September 10, 2013 at Liber 1591, Page 309. Because of the default, the undersigned has elected to declare the entire unpaid amount of the Mortgage immediately due and payable.

At the date of this notice, there is hereby claimed to be due for principle and interest on the Mortgage the sum of One Hundred Forty One Thousand Four Hundred Thirty One and 46/100 Dollars ($141,431.46). No suit or proceedings at law have been instituted to recover any part of the debt secured by the Mortgage.

Notice is hereby given that by virtue of the power of sale contained in the Mortgage and the statute in such case made and provided, and to pay said amount with interest as provided in the Mortgage, and all legal costs, charges, and expenses, including attorney fees allowed by law, the Mortgage will be foreclosed by sale of the mortgaged premises at public venue to the highest bidder at the place of holding the Circuit Court within Van Buren County, on THURSDAY, MARCH 27, 2014 at 1:00 PM local time.

The premises covered by said mortgage are situated in the Township of Lawrence, Van Buren County, Michigan and are described as:

Parcel "A" Part of the Northwest quarter of Section 34, Town 3 South, Range 15 West, described as beginning at the Northwest corner of said section 34; thence South 89 degrees 55 minutes 25 seconds East along the North line of said section 963.00 feet; thence South parallel to the West line of said section 226.00 feet; thence North 89 degrees 55 minutes 25 seconds West parallel to the North line of said section 963.00 feet to the West line of said section; thence North along said West line 226.00 feet to the point of beginning; Parcel B: Part of the Northwest quarter of Section 34, Town 3 South, Range 15 West, described as beginning at a point on the West line of said section 34 which is South 226.00 feet from the Northwest corner of said section; thence South 89 degrees 55 minutes 25 seconds East parallel to the North line of said section 963.00 feet; thence South parallel to the West line of said section 226.00 feet; thence North 89 degrees 55 minutes 25 seconds West parallel to the North line of said section 963.00 feet to the West line of said section; thence North along said West line 226.00 feet to the point of beginning. Commonly known as 68241 52nd Street, Lawrence, MI 49064. Tax Parcel No. 80-13-034-001-01.

Pursuant to Section 3240(7) of the Revised Judicature Act of 1961, as amended (MCLA 600.3240(7); MSA 27A.3240(7)), the redemption period shall be six (6) months from the date of the foreclosure sale, unless the premises are determined to be abandoned in accordance with MCLA 600.3241a; MSA 27A.3241a, in which case the redemption period shall be thirty (30) days from the date of such sale.

If the property is sold at foreclosure sale under Chapter 32 of the Revised Judicature Act of 1961, pursuant to MCL 600.3278 the Borrower [illegible] the person who buys the property at the mortgage foreclosure sale or to the mortgage holder for damaging the property during the redemption period.

Dated: February 26, 2014
For more information call:
269-321-5064
DePerno Law Office, PLLC
8176 Creekside Drive, Suite 240
Portage, MI 49024

Feb. 28-Mar. 21, 2014

STATE OF MICHIGAN

IN THE 36TH JUDICIAL CIRCUIT COURT FOR THE COUNTY OF VAN BUREN
212 Paw Paw Street, Paw Paw, MI 49079   (269) 657-8200

---

**RONALD MOFFIT, CATHLEEN
MOFFIT, AND A&P ENTERPRISES
OF MICHGAN, LLC,**

      Plaintiffs,

v

**MATTHEW W. DEPERNO AND
DEPERNO LAW OFFICE, PLLC, A
Michigan Limited Liability Company,**

      Defendant.

FILE NO. 14-64-076-CH-D

HON. JEFFREY J. DUFON
CIRCUIT COURT JUDGE

---

LAAKSONEN LAW OFFICES, P.C.
Albert W .Laaksonen II (P43920)
ROEGGE
Susan Durian Metzger (P62867)
Attorneys for Plaintiffs
226 ½ E. Michigan Avenue
Paw, MI 49079
269/655-1035

Craig S. Neckers (P24349)
SMITH HAUGHEY RICE &

Attorneys for Defendants
100 Monroe Center NW
Grand Rapids, MI 49503-2802
616/774-8000

## AFFIDAVIT OF RONALD MOFFIT

**STATE OF MICHIGAN**     )
                            ) ss
**VAN BUREN COUNTY**     )

      **NOW COMES** Affiant, Ronald Moffit, being of sound mind and lawful age, and being competent to testify in a court of law, and after first being duly sworn, deposes and says as follows:

      1. That Plaintiffs, Ronald Moffit and Cathleen Moffit in their individual capacity and as Managers of A&P Enterprises of Michigan, LLC, retained the services of DePerno Law Office PLLC on June 8, 2011 to represent them in an interpleader action filed by Homeowners Insurance Company arising from a house fire in the home that Ronald and Cathleen Moffit lived.

      2. That prior to retaining DePerno Law Office PLLC, Homeowners Insurance Company had decided to pay the claim on the loss of the home in the amount of

$251,640.00 as replacement cost for the dwelling by providing a check to the Plaintiffs in the amount of $170,620.50, less $80,298.95 to satisfy liens payable to the Internal Revenue Service in the name of Ronald Moffit and Cathleen Moffit.

3.   While the home was insured in the name of Ronald Moffit and Cathleen Moffit, the deed to the home was in the name of A&P Enterprises of Michigan, LLC, with Ronald Moffit and Cathleen Moffit as its Managers.

4.   That despite the discrepancy Homeowners Insurance Company had decided to pay the claim but wanted Mr. and Mrs. Moffit and the IRS to determine who was entitled to the $80,298.95.

5.   That when an agreement was not reached between Mr. and Mrs. Moffit and the IRS, Homeowners Insurance Company filed an interpleader action to determine who the money belonged to.

6.   That Mr. and Mrs. Moffit hired DePerno Law Office PLLC to represent them in their interpleader action and negotiate the outstanding lien with the IRS.

7.   Deperno discussed the need to file a counter complaint for reformation of the contract as it relates to ownership of the insurance policy to improve their position with the IRS.

8.   The Moffitts entered into an Engagement Agreement with DePerno on June 8, 2011 with the following stated purpose: "The services to be performed will include filing pleadings (such as an answer and counter claim for reformation of contract), motions and related answers to motions, appearing in court when required, attending depositions, and all other matters that may be involved in a litigation case, including attempting to negotiate a settlement."

9.   During the same time that the insurance company filed the interpleader action they also presented a check to Mr. and Mrs. Moffit in the amount of $116,000.00 representing the replacement costs for the personal property lost in the house fire, and for $7,360 for living expenses.

10. That in representing Mr. and Mrs. Moffit in the interpleader action, on July 18, 2011 DePerno Law Office PLLC without the knowledge or consent of his clients filed a Counter-Complaint against the insurance company alleging that more money was owed as part of the insurance claim.

11. That Mr. and Mrs. Moffit were upset when they learned that DePerno Law Office PLLC had filed a Counter-Complaint against the insurance company for more

2

money, and Mr. Moffit went directly to the insurance company and indicated that this was not what they wanted to do.

12. That the insurance company informed Mr. Moffit that they must talk only through their attorney, as all parties were represented by counsel.

13. That after filing the unauthorized Counter-Complaint, DePerno called Mr. Moffit and told him "don't get mad, I had to sue them, I believe I can get an extra $50,000.00 out the insurance company".

14. That in response to the Counter-Complaint Homeowners Insurance Company on August 8, 2011 then sued Mr. and Mrs. Moffit claiming that no money was owed to them whatsoever because the insurance policy insured the home in Moffit's name and did not cover real estate owned by A&P Enterprises of Michigan, LLC.

15. Secondly, Homeowners Insurance Company stopped payment on the $123,360.00 for the personal property loss and living expenses.

16. That on March 4, 2013, while the litigation was pending, Mr. and Mrs. Moffit were presented by DePerno Law Office PLLC with a new Fee Agreement, Promissory Note, and Security Agreement, together with a Mortgage securing fees against their home and were told that they needed to read the document and sign it.

17. That Mr. and Mrs. Moffit returned on March 5, 2013 and told Mr. DePerno that they were not comfortable signing the documents and did not believe that it was in their best interests.

18. That Mr. DePerno informed Mr. and Mrs. Moffit that if they did not sign the agreements he would fold his arms and say nothing during the Motion for Summary Disposition proceeding to take place in the middle of March.

19. The message to Mr. and Mrs. Moffit was clear and Mr. and Mrs. Moffit felt they had no choice but to sign the Promissory Note and Mortgage Agreement against their home.

20. That a Trial regarding the Homeowners Insurance coverage took place on October 13, 2013, lasting approximately two (2) hours.

21. That the litigation started by DePerno Law Office PLLC was not concluded until February 20, 2014, when Mr. and Mrs. Moffit were shown a check in the amount of $109,879.00 from Homeowners Insurance Company made payable to Mr. and Mrs. Moffit and DePerno Law Office PLLC.

22. That the Judges decision provided that the IRS received the full amount of there $80,000.00 lien which was the subject of the interpleader action, and the Moffits

3

received $109,879.00, which was paid by a check shown to them by Deperno on February 20, 2014.

23. The $109,879.00 was in lieu of the $123,360.00 for which payment was stopped on or about June of 2011.

24. That on February 20, 2014, the same day they were shown the check, DePerno Law Office PLLC submitted to Mr. and Mrs. Moffit a bill for $137,779.38.

25. That prior to February 20, 2014, the last time Mr. and Mrs. Moffit had been apprised of the status of their bill was in March of 2013 and they were told the bill was at $53,126.80.

26. That just prior to Trial, a Mortgage Modification was executed on September 10, 2013, wherein DePerno Law Office PLLC removed his lien rights against the insurance proceeds payable to the Mortgagor as a result of the pending litigation.

27. That despite DePerno Law Office PLLC's recognition that his mortgage must be modified to exclude any claim against the insurance proceeds, DePerno Law Office has refused to turn over the $109,879.00 in insurance proceeds to Mr. and Mrs. Moffit.

28. That when Mr. and Mrs. Moffit expressed confusion, concern and eventually outrage at the size of DePerno Law Office PLLC's bill, as presented to them on February 20, 2014, Mr. DePerno physically grabbed Mr. Moffit by the shirt and informed him that if he does not immediately pay the attorney fees owed that Mr. and Mrs. Moffit would lose their home in a matter of weeks.

29. That Mr. and Mrs. Moffit believe that the majority of the attorney fees billed by DePerno Law Office PLLC would not have been necessary, but for Mr. DePerno's unauthorized Counter-Complaint against the insurance company.

30. That Mr. and Mrs. Moffit also received at a minimum $13,421.00 less from the insurance company than if the insurance company had not stopped payment on the check already issued.

31. That in reviewing Mr. DePerno's billings Mr. and Mrs. Moffit have discovered to date at minimum:

    a. That Mr. DePerno charged approximately $13,000.00 to fight with his former law firm of Veritas Group regarding possession of Mr. and Mrs. Moffit's file;

    b. That Mr. DePerno charged them approximately $18,000.00 related to an Expert Witness who the Court determined could not testify as an Expert Witness because he was testifying as to insurance matters for which he was not properly license/certified;

    c. That Mr. DePerno billed $6,000.00 for attendance a deposition that he told Mr. and Mrs. Moffit would only cost $1,500.00;

4

    d. Mr. and Mrs. Moffit believe that there are numerous other examples of overbilling or padded billings by Attorney DePerno.

32. That Mr. DePerno also told Mr. and Mrs. Moffit that he wanted Mr. and Mrs. Moffit to sue his old law firm, Veritas Group, because he estimated that it cost him $20,000.00 to reassemble their file due to the condition he received the file from the Veritas Group.

33. That Mr. and Mrs. Moffit are concerned that the payments they have made to DePerno Law Office PLLC are not reflected in his billings and that DePerno Law Office PLLC failed to provid any type of statement indicating the payments Mr. and Mrs. Moffit have made and how they have been applied to their account prior to the filing of this lawsuit.

34. That 6 days after the Moffits refused to pay the $137,000.00 bill in full, Deperno started foreclosure on two separate property's, their current home with an estimated value of over $150,000.00, and the land that their former home sat on with an estimated value of Over $50,000.00.

35. Deperno took this action while maintaining possession of the check for $109,879.00.

**AND FURTHER,** Affiant sayeth not.

_Ronald Moffit_

Ronald Moffit, Affiant

On this 15th day of May, 2014, before me, a Notary Public in and for said County, personally appeared Ronald Moffit, the person known to me to be the individual described herein, who has signed the above named document, and sworn under oath to this as his free and voluntary act.

_Amy J. Niewoonder_

Amy J. Niewoonder, Notary Public
Kalamazoo County acting in Van Buren
County, Michigan
My Commission Expires: 05/15/2019

Prepared by:
LAAKSONEN LAW OFFICES, P.C.
226½ East Michigan Avenue
Paw Paw, Michigan 49079
269/655-1035

# STATE OF MICHIGAN

## IN THE 36TH CIRCUIT COURT FOR THE COUNTY OF VAN BUREN

RONALD MOFFIT, CATHLEEN MOFFIT,
and A&P ENTERPRISES OF MICHIGAN,
LLC

        Plaintiffs,

vs.

MATTHEW DEPERNO and DEPERNO
LAW OFFICES, PLLC

        Defendants.

Case No. 14-64-076-CH-D

HON. JEFFREY J. DUFON
CIRCUIT COURT JUDGE

_____/

LAAKSONEN LAW OFFICES, P.C.
Albert W. Laaksonen II (P43920)
Susan Durian Metzger (P62867)
226 ½ E. Michigan Avenue
Paw Paw, MI 49079
269/655-1035

_____/

## SECOND AMENDED COMPLAINT

### PARTIES AND JURISDICTION

1. Plaintiffs, Ronald and Cathleen Moffit (hereinafter, "Moffits"), are husband and wife, and they reside at 68241 52nd Street, Lawrence Township, Van Buren County, Michigan 49064.

2. Plaintiff, A & P Enterprises of Michigan, LLC, is an LLC formed under the laws of Michigan and is managed by Ronald Moffit and Cathleen Moffit.

3. Defendant, Matthew DePerno, is an attorney who resides at 5717 Denali Street, Mattawan, Michigan, Kalamazoo County, and who regularly conduct's business in Van Buren County.

1

4.  DePerno Law Office, PLLC is a law firm wholly owned and operated by Defendant Matthew DePerno, and is currently located at 8175 Creekside Drive, Suite #240, Portage, Michigan 49024, and which regularly conducts business in Van Buren County.

5.  Both the parties Attorney /client relationship leading to this dispute and this dispute involve real property, described below, which is located in Van Buren County, to-wit:

Situated in the Township of Lawrence, County of Van Buren, and State of Michigan, to-wit:

**PARCEL NO. 1:**
The South 165 feet of the North 495 feet of the Northeast Quarter of Section 33, Town 3 South, Range 15 West, according to the Government Survey thereof.
Commonly known as: 68298 52nd Street, Lawrence, MI 49064
Tax Parcel No: 80-13-033-005-00.

**PARCEL NO. 2:**
Parcel A:  Part of the Northwest Quarter of Section 34, Town 3 South, Range 15 West, described as beginning at the Northwest Corner of said Section 34; thence South 89 degrees 55 minutes 25 seconds East along the North line of said Section 963.00 feet; thence South parallel to the West line of said Section 226.00 feet; thence North 89 degrees 55 minutes 25 seconds West parallel to the North line of Section 963.00 feet to the West line of said Section; thence North along said West line 226.00 feet to the point of beginning.

Parcel B:  Part of the Northwest Quarter of Section 34, Town 3 South, Range 15 West, described as beginning at a point on the West line of said Section 34

2

which is South 226.00 feet from the Northwest Corner of said Section; thence

South 89 degrees 55 minutes 25 seconds East parallel to the North line of said

Section 963.00 feet; thence South parallel to the West line of said Section 226.00

feet; thence North 89 degrees 55 minutes 25 seconds West parallel to the North

line of said Section 963.00 feet to the West line of said Section; thence North

along said West line 226.00 feet to the point of beginning.

Commonly known as: 68241 52nd Street, Lawrence, MI 49064

Tax Parcel No. 80-13-034-001-01

6. Jurisdiction is therefore appropriate in the Circuit Court, and venue is proper in Van
   Buren County.

## COMMON ALLEGATIONS

7. Each of the above allegations is hereby incorporated as if made herein.

8. In 2001, the Moffits hired attorney Matthew DePerno to resolve a tax debt to the IRS of
   approximately $36,000.

9. The IRS recorded a tax lien against the Moffits.

10. The Moffits (Ron and Kathleen) hereinafter "Mofffits", residence in 2010 was held in an
    LLC named A & P Enterprises of Michigan, LLC, and was insured in their individual
    names.

11. On December 20, 2010, the residence (described above as parcel "1") was destroyed by
    fire.

12. Before Plaintiffs hired DePerno regarding the house fire, Homeowners Insurance
    Company paid Plaintiffs $170,620.50, and retained an additional $80,298.95 to satisfy
    recorded IRS tax liens,

3

13. The Moffits used these funds to purchase the real properties located at 555 Shady Lane, Decatur, Michigan and 575 Rosewood Avenue, Decatur, Michigan.

14. "Homeowners Insurance" filed an interpleader action over the retained $80,298.95 in Van Buren County Circuit Court, Case No. 11-0060-828-CZ, on March 11, 2011. Pursuant to MCR 2.113 (F) (1) (b), a copy of the interpleader action is in DePerno's possession.

15. The IRS had the case moved to the United States District Court for the Western District of Michigan, becoming Case No 11-cv-00517 on May 19, 2011.

16. Homeowners Insurance -hereinafter HOIC- informed the Moffitts that despite the discrepancy with the named insured's, that they were going to honor the claim and issued additional checks for Personal Property ($116,000.00) and Living Expenses ($7,360.00) to the Moffits.

17. The Moffitts entered into an Engagement Agreement with DePerno on June 8, 20██ with the following stated purpose: "The services to be performed will include filing pleadings (such as an answer and counter claim for reformation of contract), motions and related answers to motions, appearing in court when required, attending depositions, and all other matters that may be involved in a litigation case, including attempting to negotiate a settlement." Pursuant to MCR 2.113 (F) (1) (b), a copy of the Engagement Agreement is in DePerno's possession.

18. Without authority, and against Moffits express wishes DePerno filed a Counter-Claim against HOIC demanding more money on July 18, 2011. Pursuant to MCR 2.113 (F) (1) (b), a copy of the Counter-Claim is in DePerno's possession.

4

19. Moffits had only given DePerno authority to file a counterclaim for reformation of contract. A claim they were advised was necessary to exclude the IRS from having it's lien to attach to the property.

20. After filing the unauthorized Counter-Claim, DePerno stated to Mr. Moffitt, "Now don't get mad, I had to sue them, I believe I can get an extra $50,000.00 out the insurance company."

21. As a result of the unauthorized Counter-Complaint, Homeowners stopped payment on the checks totaling $123,360, and filed an Amended Complaint on August 8, 2011 for the return of 100% of the money paid on the claim. Pursuant to MCR 2.113 (F) (1) (b), a copy of the Amended Complaint is in DePerno's possession.

22. The Moffits attempted to speak directly with Homeowners to settle with them, but Homeowners would not speak directly with a represented, opposing party.

23. In March of 2013, DePerno presented the Moffits with a bill for $53,000.00 and asked them to sign a new Fee Agreement, Promissory Note and Future Advance Mortgage.

24. The Moffits executed the documents presented to them and drafted by DePerno. Pursuant to MCR 2.113 (F) (1) (b), a copy of the March 5, 2013 Fee Agreement, Promissory Note and Future Advance Mortgage are in DePerno's possession.

25. During the subsequent 11 months before the case ended, DePerno failed to keep the Moffits apprised of the status of their bill.

26. On September 10, 2013, the Future Advance Mortgage was amended to remove DePerno's security interest in any eventual settlement check. Pursuant to MCR 2.113 (F) (1) (b), a copy of the Amended Future Advance Mortgage is in DePerno's possession.

5

27. On January 27, 2014, HOIC was ordered to pay $109,879 to the Moffits, and $80,000 to the IRS on the Moffits behalf. Pursuant to MCR 2.113 (F) (1) (b), a copy of Order is in DePerno's possession.

28. As a direct result of DePerno's unauthorized Counter-Complaint against Homeowners Insurance for additional payments under the policy, the Moffits lost $13,479.00 together with the lost right to make additional claims that might otherwise have been allowed such as recaptured depreciation and additional living expenses.

29. On or about February 20, 2014, Defendant presented the Moffits with a bill for $137,779.38 and a check from auto owners for $109,879 made payable to Moffits and DePerno. Pursuant to MCR 2.113 (F) (1) (b), a copy of the billing and check from auto owners are in DePerno's possession.

30. Despite the clear prohibitions in the Mortgage Modification, Defendant demanded that the Moffits sign the insurance check over to him.

31. On February 26, 2014, DePerno began publication of foreclosure of the Property. Pursuant to MCR 2.113 (F) (1) (b), a copy of the publication for foreclosure is in DePerno's possession.

32. In March of 2014, the Moffits received notice of foreclosure and contacted new counsel. Pursuant to MCR 2.113 (F) (1) (b), a copy of the Notice of Foreclosure is in DePerno's possession.

33. New counsel quickly made a settlement offer to DePerno, who rejected it out of hand.

34. New counsel then asked DePerno to agree to adjourn the sheriff's sale while the Moffits negotiated a payment plan, but DePerno refused to do so unless the Moffits signed the settlement check over to him.

6

## COUNT I: BREACH OF CONTRACT

35. Each of the above allegations is hereby incorporated as if made herein.

36. The Moffitts entered into an Engagement Agreement with DePerno on June 8, 2011 with the following stated purpose: "The services to be performed will include filing pleadings (such as an answer and counter claim for reformation of contract), motions and related answers to motions , appearing in court when required, attending depositions, and all other matters that may be involved in a litigation case, including attempting to negotiate a settlement." Pursuant to MCR 2.113 (F) (1) (b), a copy of the agreement and the original are in Deperno's possession.

37. The Moffits executed a document entitled "ENGAGEMENT AND FEE AGREEMENT AND PROMISSORY NOTE AND SECURITY AGREEMENT" ("Security Agreement") on or about March 5, 2013. Pursuant to MCR 2.113 (F) (1) (b), a copy of the agreement and the original are in DePerno's possession.

38. The Moffits simultaneously executed a document entitled "Future Advance Mortgage". Pursuant to MCR 2.113 (F) (1) (b), a copy of the Mortgage and the original are in DePerno's possession.

39. On or about September 10, 2013, the Moffits executed a document entitled, "Mortgage Modification". Pursuant to MCR 2.113 (F) (1) (b), a copy of the amended mortgage and the original are in DePerno's possession.

40. Each of these documents was written by DePerno.

41. Paragraph 2.3 of the Security Agreement specifically required DePerno to bill the Moffits every month.

7

42. In fact, DePerno did not bill the Moffits in any of the 13 months between December, 2012 and February, 2014.

43. The Moffits were shocked to learn that DePerno's bill exceeded $137,000.

44. As the direct result of DePerno's breach, the Moffits were unable to prepare for payment of such an enormous bill.

45. Thus, even if DePerno's claimed fees were not substantially overstated, his failure to bill the Moffits in accordance with the Security Agreement that he drafted was the proximate cause of the Moffits' inability to pay his fees.

46. Moreover, the Security Agreement expressly limits DePerno's security to $53,126.80, plus those bills which accrued after it's execution on March 5, 2013.

47. $30,605.03 of Deperno's claimed bill is not covered by the Security Agreement.

48. DePerno has breached his Security Agreement and Mortgage by claiming a secured interest in claimed fees not covered by the security agreement and mortgage.

49. DePerno's breach of the Security Agreement and Mortgage together with his decision to foreclose by advertisement within just days of the Moffits expressing concerns about the bill they were just presented with have caused the Moffits to incur unnecessary attorney fees to seek a temporary restraining order.

50. DePerno breached the June 8, 2011 engagement agreement when he without authority, and against Moffits express wishes filed a Counter-Claim against HOIC demanding more money on July 18, 2011.

51. As a direct result of DePerno's breach in filing the unauthorized Counter-Complaint against Homeowners Insurance for additional payments under the policy, the Moffits lost $13,479.00 in already paid insurance proceeds together with the lost right to make

8

additional claims that might otherwise have been allowed such as recaptured depreciation and additional living expenses.

52. Said breach also damaged Plaintiffs through the cost of DePerno's self created claimed attorney fees that are in excess of $137,000.00.

53. Said breach also caused Plaintiffs to loose the use of their $123,360.00 during the pendency of the litigation.

54. DePerno's bill to Plaintiffs breached the parties retainer agreements of both June 8, 2011 and March 5, 2013 by overstating the money due and owing, over-billing under those documents or bills, or for fees that are not justified, including, but not limited to, the following:

    a. DePerno billed over $13,000 for retrieving and sorting documents from his former firm, Veritas Group, regarding possession and control of Plaintiffs' file and escrow account;

    b. DePerno advised Plaintiffs to file a malpractice claim against his malpractice carrier, claiming that it might cost $20,000 to reassemble his file once it was returned by his old law firm, and unjustifiably billed fees for the expense.

    c. When DePerno hired an "expert" witness, he required the Moffits to pay the witness's $2000 retainer, then billed them for an additional $3000 in reimbursement for the witness's fees, plus an additional $13,000 in DePerno's time speaking with the "expert witness", even though the Court disqualified the witness because he was neither certified nor licensed in the area in which he was testifying.

    d.  DePerno charged $6000 to attend a deposition that he told the Moffits would only

        cost them $1500.

    e.  Deperno CHARGED $1,500 to meet with and execute the March 5th, 2013

        engagement agreement and Mortgage.

WHEREFORE, the Moffits respectfully ask this Honorable Court to enter an order prohibiting

the Sheriff's sale of the Property until the court has determined what amount is owed to DePerno

by the Moffits, and award damages caused by filing the unauthorized counter complaint as

follows:

(a) Declaring that Plaintiffs are not indebted to Defendants for the claimed attorney fees, or
in the alternative determine an appropriate fee;

(b) Award damages caused by filing the unauthorized counter complaint to include but not
be limited to, $13,421.00 in lost insurance proceeds, the value of the lost opportunity to
submit additional claims, the value of the lost use of the Insurance proceeds.

(c) That any further foreclosure proceedings be held before this Court, pursuant to MCL
600.3101ff

(d) Granting any other relief agreeable to equity and good conscience  to include but not be
limited to, $13,421.00 in lost insurance proceeds, the value of the lost opportunity to
submit additional claims, the value of the lost use of the Insurance proceeds.  Grant any
other relief agreeable to equity and good conscience.

## COUNT II: VOID SET ASIDE OR REFORM OF MORTGAGE AND SECURITY

### AGREEMENT

55. Each of the above allegations is hereby incorporated as if made herein.

56. Several provisions of the several agreements are unethical, unconscionable, or unenforceable: (a)The March 5 , 2013 agreements were used to support the initiation of foreclosure proceedings just 6 days after the Moffits were presented with a bill for $137,000. (b) Agreements were used to foreclose on Moffits home within 6 days of completion of legal work and with out providing an opportunity to contest the bill, (c) agreements were used to foreclose by advertisement on multiple parcels valued at amounts well in excess of amount needed to fulfill claimed debt, when sale of one property would have been sufficient to cover underlying debt in violation of foreclosure statute, and (d) foreclosure by advertisement was pursued on a claimed and contested $137,000.00 debt where DePerno was already holding $109,000.00 of Moffits' litigation proceeds.

57. The Security Agreement and Future Advance Mortgage were executed under duress: When Moffits refused to execute revised engagement and mortgage agreements, DePerno threatened that if they did not sign the new documents he would remain silent at the upcoming motions for Summary Disposition.

58. The agreements contain more than 40 errors of spelling, typography, and grammar, together with several instances of conflicting language.

59. The terms of the agreements are unfair and unconscionable both as drafted and as enforced.

11

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter an Order:

    a.  Voiding the March 5, 2013 Future Advance Mortgage, Mortgage Modification, and Security Agreement in their entirety or, in the alternative;

    b.  Removing any unenforceable/unethical/or contradictory provisions contained in the Security Agreement, Future Advance Mortgage, and Mortgage Modification.

    c.  Issue injunctive relief stopping the foreclosure by advertisement sale and order that any further proceedings be handled judicially.

    d.  Determine what portion of DePerno's fees are actually secured by the Security Agreement, Promissory note and Mortgage.

## COUNT III: BATTERY and ASSAULT

60. Each of the above allegations is hereby incorporated as if made herein.

61. When Mr. and Mrs. Moffit expressed confusion, concern and eventually outrage at the size of DePerno Law Office PLLC's bill as presented to them on February 20, 2014, Mr. DePerno physically grabbed Mr. Moffit by the shirt and informed him that if he does not immediately pay the attorney fees owed that Mr. and Mrs. Moffit would lose their home in a matter of weeks.

62. That Mr. Moffitt as a result of this offensive unwanted contact suffered mental anguish, fright, shock, outrage, indignity and uncertainty.

63. That Mrs. Moffitt witnessed the offensive grabbing of her husband and was told by Mr. Deperno to leave the room as this was between him and her husband.

64. That Mrs. Moffitt as a result of witnessing this offensive unwanted contact was in fear for both her husband's and her own safety and thereby suffered mental anguish, fright, shock, outrage, indignity and uncertainty.

65. The fact that Mr. Deperno was the attorney the Moffitts hired to protect them and someone in whom they had put their trust, only served to intensify mental anguish, fright, shock, outrage, indignity and uncertainty

WHERFORE, Plaintiffs respectfully ask this Honorable Court to enter an Order:

    a.    Awarding Plaintiffs in excess of $50,000.00 in Compensatory Damages;

    b.    Grant any other relief agreeable to equity and conscience.

## COUNT IV: VIOLATION OF MICHIGAN'S

## FORECLOSURE BY ADVERTISEMENT STATUTE

66. Each of the above allegations is hereby incorporated as if made herein.

67. DePerno did not make any request for payment prior to February 20, 2014.

68. DePerno initiated foreclosure by advertisement on February 26, 2014. Pursuant to MCR 2.113 (F) (1) (b), a copy of the notice of foreclosure by advertisement is in DePerno's possession.

69. The Security Agreement requires that Plaintiffs be given at least 7 days to pay, but they were not.

70. In violation of MCL 600.3204(a), DePerno initiated the foreclosure even though Plaintiffs did not default under the terms of the mortgage.

71. In violation of MCL 600.2431, DePerno added attorney fees to the claimed debt balance of approximately $4,000.00 when the statue limits fees to $75.00.

72. In violation of MCL 600.3224, DePerno attempted to sell more lots than were necessary to satisfy the amount due on the mortgage.

WHEREFORE, the Moffits respectfully ask this Honorable Court to enter an Order prohibiting the Sheriff's sale of the Property, and that any further foreclosure proceedings be held before this Court, pursuant to MCL 600.3101ff. Moffits further request an award of actual attorney fees

13

incurred to stop the attempted sale of the mortgaged property as the sale was done in violation of the Mortgage foreclosure statute

## COUNT V: LEGAL MALPRACTICE

73. Each of the above allegations is hereby incorporated as if made herein.

74. DePerno had an attorney-client relationship with Plaintiffs.

75. The Moffitts entered into an Engagement Agreement with DePerno on June 8, 2011 with the following stated purpose: "The services to be performed will include filing pleadings (such as an answer and counter claim for reformation of contract), motions and related answers to motions , appearing in court when required, attending depositions, and all other matters that may be involved in a litigation case, including attempting to negotiate a settlement." Pursuant to MCR 2.113 (F) (1) (b), a copy of the June 8, 2011 Engagement Agreement is in DePerno's possession.

76. Plaintiffs gave DePerno clear, unambiguous instructions to not file a Counter-Complaint contesting the insurance settlement with Home Owners Insurance.

77. Despite the clear instructions from Plaintiffs, DePerno filed a Counter-Complaint contesting the insurance settlement against Home Owners Insurance in Plaintiffs' names.

78. Filing a Counter-Complaint against the express instructions of clients is, at a minimum, a breach of an attorney's duty to his clients to follow their instructions. Pursuant to MCR 2.113 (F) (1) (b), a copy of the unauthorized Counter-Complaint is in DePerno's possession.

79. As the direct result of filing the unauthorized counter complaint, Plaintiffs accrued more than $137,000 in attorney fees to DePerno. Pursuant to MCR 2.113 (F) (1) (b), a copy of the DePerno's billings are in his possession.

14

80. As the direct result of filing the unauthorized counter complaint, Homeowners stopped payment on settlement checks made payable to Plaintiff totaling more than $123,360.

81. After years of subsequent litigation by DePerno against Home Owners Insurance in Plaintiffs' names, Plaintiffs received only $109,879.00 of the $123,360 that they would have received if DePerno had never filed the unauthorized claims in the first place.

WHERFORE, Plaintiffs respectfully ask this Honorable Court to enter an Order:

a.  Declaring that Plaintiffs are not indebted to Defendants for the claimed attorney fees;

b.  Award damages caused by filing the unauthorized Counter-Complaint to include but not be limited to, $13,421.00 in lost insurance proceeds, the value of the lost opportunity to submit additional claims, the value of the lost use of the Insurance proceeds.

c.  That any further foreclosure proceedings be held before this Court, pursuant to MCL 600.3101ff

d.  Grant any other relief agreeable to equity and good conscience.

## COUNT VI: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

82. Each of the above allegations is hereby incorporated as if made herein.

83. DePerno had an attorney client relationship with Plaintiffs.

84. The following are examples of DePerno's extreme and outrageous conduct that was done with either intent or recklessness;

a.  Filing unauthorized Counter-Complaint as more fully alleged above;

15

b.    Not regularly billing clients as provided in the Retainer Agreement;

d.    Providing a bill of $137,000.00 and demanding immediate payment without giving the client an opportunity to review the bill;

e..    Including in the bill thousands of dollars for Defendants' own fight with a former law firm over the possession of the client's file.

f.    Physically grabbing Mr. Moffit in Mr. DePerno's office when Mr. Moffit would not sign over checks representing $110,000.00 of Plaintiffs' money;

g.    Demanding the execution of a Mortgage against Plaintiffs' property while in the midst of litigation and threatening to not speak on Plaintiffs' behalf at an upcoming hearing unless the mortgage/security agreements were signed.

h.    Threatening upon presentation of the $137,000.00 bill that if Plaintiffs did not immediately pay the bill that he would take Plaintiffs' home in a matter of weeks;

i.    Initiating foreclosure actions five/six days after presenting the $137,000.00 bill;

j.    Failing to give Plaintiffs an opportunity to review the bill/contest the bill/prepare to pay the bill before instituting foreclosure actions;

k.    Using the foreclosure by advertisement process to avoid any judicial oversight of Defendants' actions;

l.    Advertising for sale to the foreclosure by advertisement process all of the parcels identified in the Mortgage Agreement when all parcels were not necessary to

fulfill the underlying debt in violation of the foreclosure by advertisement statute as alleged earlier in this Complaint.

m.    Committing all of the above actions while acting as their retained counsel.

n.    All other acts of Defendant as earlier alleged in this document.

85. Defendants' actions caused Plaintiffs to incur unnecessary bills with the Defendant, caused Plaintiffs to execute a Mortgage against real estate under conditions of duress, caused Plaintiffs to receive an exorbitant attorney fee bill without having received monthly billings, or otherwise having had an opportunity to review or challenge monthly billings, cause Plaintiffs otherwise to experience severe emotional distress in the physical confrontation by Defendant at Defendant's offices, together with threats of taking Plaintiffs' home and the use of the foreclosure by advertisement statute in violation of its own provisions to foreclose against Plaintiffs' property without any choice but to institute legal proceedings against the Defendant.

86. That all of Defendants' actions were a direct cause of severe emotional distress to the Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court award damages as to Plaintiffs including but not limited to:

(a) Exemplary Damages;

(b) Actual Attorney fees incurred in attempting to protect Plaintiffs' real estate from being taken by Defendant;

17

(c)  All other damages agreeable to equity and good conscience:

I DECLARE THAT THE ABOVE STATEMENTS ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

Dated June 12, 2014                           Respectfully Submitted,

                                              LAAKSONEN LAW OFFICES, P.C.

                                              By: _____
                                                    Albert W. Laaksonen II (P43920)
                                                    Attorney for Plaintiffs

18

# EXHIBIT D

2004 Mich. App. LEXIS 2243, *



## 2 of 2 DOCUMENTS

### EDWARD A. DEUTSCH, Plaintiff-Appellant, v RONALD R. BERLINER, Defendant-Appellee.

### No. 246991

### COURT OF APPEALS OF MICHIGAN

### *2004 Mich. App. LEXIS 2243*

### August 24, 2004, Decided

**NOTICE:** [*1] THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**SUBSEQUENT HISTORY:** Appeal denied by *Deutsch v. Berliner, 2005 Mich. LEXIS 552 (Mich., Apr. 26, 2005)*

**PRIOR HISTORY:** Washtenaw Circuit Court. LC No. 02-000589-NZ.

**DISPOSITION:** Affirmed.

**JUDGES:** Before: Hoekstra, P.J., and Cooper and Kelly, JJ.

## OPINION

MEMORANDUM.

Plaintiff appeals as of right the order granting defendant's motion for summary disposition. We affirm. This appeal is being decided without oral argument pursuant to *MCR 7.214(E)*.

Plaintiff brought this defamation action based on defendant's republication of allegedly defamatory statements through an e-mail attachment of an item contained in a Missouri court record. The trial court granted summary disposition, finding that the document was a record generally available to the public, and damages could not be awarded under *MCL 600.2911(3)*.

*MCL 600.2911(3)* provides in relevant part:

Damages shall not be awarded in a libel action for the publication or broadcast of a fair and true report of matters of public record, a public and official proceeding, or of a governmental notice, announcement, written or recorded report or record [*2] generally available to the public, or act or action of a public body, or for a heading of the report which is a fair and true headnote of the report. This privilege shall not apply to a libel which is contained in a matter added by a person concerned in the publication or contained in the report of anything said or done at the time and place of the public and official proceeding or governmental notice, announcement, written or reported report or record generally available to the public, or act or action of a public body, which was not part of the public and official proceeding or governmental notice, announcement, written or recorded report or record generally available to the public, or act or action of a public body.

To establish a defamation claim, the plaintiff must show that a false or defamatory statement was made, and there was an unprivileged publication to a third party. *Kefgen v Davidson, 241 Mich. App. 611, 617; 617 N.W.2d 351 (2000)*. *MCL 600.2911(3)* provides a fair reporting privilege for public documents. *Id, 623, n 7.*

Here, plaintiff's claim is based on defendant's republication of a document that was [*3] included in the Missouri court file. Plaintiff does not dispute that the document was a public record. Instead, he asserts that defendant improperly used *MCL 600.2911(3)* to shield his initial defamatory statements. However, there is no

2004 Mich. App. LEXIS 2243, *

exception in the statute that would allow plaintiff to defeat the privilege.

Affirmed.

/s/ Joel P. Hoekstra

/s/ Jessica R. Cooper

/s/ Kirsten Frank Kelly